**UNREPORTED DECISIONS CITED IN
APPELLEES' BRIEF**

**IT LITIGATION TRUST vs. D'ANIELLO,** *et al.*

IT GROUP INC., et al., Debtor. IT LITIGATION TRUST, Plaintiff, v. DANIEL A. D'ANIELLO, FRANCIS J. HARVEY, JAMES C. McGILL, RICHARD W. POGUE, PHILIP B. DOLAN, E. MARTIN GIBSON, ROBERT F. PUGLIESE, CHARLES W. SCHMIDT, JAMES DAVID WATKINS, ANTHONY J. DELUCA, HARRY J. SOOSE, THE CARLYLE GROUP, THE CARLYLE GROUP L.L.C., CARLYLE PARTNERS II, L.P., CARLYLE SBC PARTNERS, II, L.P., CARLYLE INTERNATIONAL PARTNERS II, L.P., CARLYLE INTERNATIONAL PARTNERS III, L.P., C/S INTERNATIONAL PARTNERS, CARLYLE INVESTMENT GROUP, L.P. CARLYLE-IT INTERNATIONAL PARTNERS, L.P., CARLYLE-IT INTERNATIONAL PARTNERS II, L.P., CARLYLE-IT PARTNERS L.P., and T.C. GROUP, L.L.C., Defendants.

Civil Action No. 04-1268-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 27869

November 15, 2005, Decided

**SUBSEQUENT HISTORY:** Related proceeding at **Fed. Ins. Co. v. D'Aniello, 2006 U.S. Dist. LEXIS 4463 (W.D. Pa., Feb. 6, 2006)**
Reconsideration denied by, Motion denied by **IT Group, Inc. v. D'Aniello, 2006 U.S. Dist. LEXIS 5035 (D. Del., Feb. 9, 2006)**

**PRIOR HISTORY:**  {*1}
Chapter 11. Case No. 02-10118 Jointly Administered.

**COUNSEL:** Jeffrey M. Schlerf, Thomas H. Kovach, Eric M. Sutty, The Bayard Firm, Wilmington, Delaware, for Plaintiff. Of Counsel: Richard S. Wayne, Thomas P. Glass, John M. Levy, Strauss & Troy, Cincinnati, Ohio; Mark D. Collins, Marcos A. Ramos, Richards, Layton & Finger, P.A., Wilmington, Delaware; Roger D. Anderson, Smith, Katzenstein & Furlow LLP, Wilmington, Delaware.

Ronald S. Gellert, Eckert, Seamans, Cherin & Mellott, LLC, Wilmington, Delaware, for Defendants. Of Counsel: Thomas L. Patten, David A. Becker, Latham & Watkins, LLP, Washington, D.C.; Laurie B. Smilan, Latham & Watkins, LLP, Reston, Virginia; Charles A. De Monaco, Kimberly L. Haddox, Dickie McCamey & Chilcote, P.C., Pittsburgh, Pennsylvania; Mark A. Willard, Paul D. Steinman, F. Timothy Grieco, Eckert, Seamans, Cherin & Mellot, LLC, Pittsburgh, Pennsylvania.

**JUDGES:** JORDAN, District Judge.

**OPINION BY:** Kent A. Jordan

**OPINION: MEMORANDUM OPINION**

November 15, 2005
Wilmington, Delaware

Kent A. Jordan

**JORDAN, District Judge**

**I. INTRODUCTION**

Before me are Motions to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) and for {*2} Failure to State a Claim (D.I. 37) filed by defendants Daniel A. D'Aniello ("D'Aniello"), Francis J. Harvey ("Harvey"), James C. McGill ("McGill"), Richard W. Pogue ("Pogue"), Phillip B. Dolan ("Dolan"), E. Martin Gibson ("Gibson"), Robert F. Pugliese ("Pugliese"), Charles W. Schmidt ("Schmidt"), James David Watkins ("Watkins"), Anthony J. DeLuca ("DeLuca"), Harry J. Soose ("Soose"), and the following parties (collectively referred to as the "Carlyle Defendants"): The Carlyle Group, The Carlyle Group, L.L.C., Carlyle Partners II, L.P., Carlyle SBC Partners, II, L.P., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle Investment Group, L.P., Carlyle-IT International Partners, L.P., Carlyle-IT International Partners II, L.P., Carlyle-IT Partners L.P., and T.C. Group, L.L.C. n1

- - -Footnotes- - -

n1 All of the defendants are referred to collectively as the "Defendants."

- - -End Footnotes- - -

The First Amended Complaint (D.I. 30, the "Complaint"), filed by IT Litigation Trust ("Plaintiff") {*3} alleges in Counts I-V n2 that Defendants, as directors, officers, and controlling shareholders of the IT Group, Inc. (the "IT Group" or the "Company"),

breached their corporate fiduciary duties, that their acts constituted waste of corporate assets, and that the Carlyle Defendants aided and abetted the other Defendants' breach of fiduciary duties. (D.I. 30 at PP 58-79.) Plaintiff also alleges, in Counts VI-VIII, that payments made by the IT Group to certain Defendants are avoidable preferences or fraudulent transfers under the Bankruptcy Code and Delaware state law. (*Id.* at PP 80-115.) Finally, Plaintiff alleges in Count IX that the directors unlawfully paid dividends to the Carlyle Defendants. (*Id.* at PP 116-18.)

- - -Footnotes- - -

n2 The Complaint sets forth nine theories of recovery, which are denominated as "claims for relief and, for convenience, are herein designated as "Counts." Count I alleges that the IT Group directors and officers breached their corporate fiduciary duties. Count II makes the same allegations against the directors and officers under the "Trust Fund" doctrine, explained *infra* note 8. Count III alleges that the directors and officers wasted corporate assets. Count IV alleges that the Carlyle Defendants breached their corporate fiduciary duties. Count V alleges that the Carlyle Defendants aided and abetted the breaches committed by the directors and officers. Count VI seeks, under the Bankruptcy Code, to avoid certain preferential transfers. Count VII alleges that payments made to the Carlyle Defendants were constructively fraudulent transfers. Count VIII alleges that payments made to the Carlyle Defendants and certain individual defendants were actual fraudulent transfers. Count IX alleges that dividends were paid unlawfully to the Carlyle Defendants.

- - -End Footnotes- - -
  {*4}

Defendants contend that the claims based exclusively on Delaware state law, Counts I-V and IX, do not fall within the subject matter jurisdiction of this court, either under the statute providing for original jurisdiction over bankruptcy cases, **28 U.S.C. § 1334**, or under that providing for supplemental jurisdiction, **28 U.S.C. § 1367.** Defendants also contend that Counts I-VI and IX must be dismissed in their entirety, and that Counts VII and VIII must be dismissed in part, for failure to state a claim upon which relief can be granted. For the reasons that follow, I will deny

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, and I will grant in part and deny in part Defendants' Motion to Dismiss for Failure to State a Claim.

## II. BACKGROUND n3

- - -Footnotes- - -

n3 The following background information is drawn from the parties' submissions and does not constitute findings of fact.

- - -End Footnotes- - -

A. The Carlyle Defendants' Investment in the IT Group

The IT Group was {*5} a Delaware corporation with its principal office in Monroevillie, Pennsylvania, which provided services in "consulting, engineering, construction, environmental remediation, and facilities and waste management." (Complaint, D.I. 30 at P 30.) These services "included the identification of contaminants in soil, air, and water, as well as the subsequent design and execution of remedial solutions." (*Id.*)

The Carlyle Group is a private merchant bank headquartered in Washington D.C. that invested in the IT Group "through a number of entities that it owns or controls." (*Id.* at P 14.) Specifically, in or around November 1996, the Carlyle Defendants collectively invested $ 45 million in the IT Group. (*Id.* at P 31.) That sum included investments by several Cayman Islands limited partnerships, i.e., Carlyle International Partners II, L.P., Carlyle International Partners III, L.P., C/S International Partners, Carlyle-IT International Partners, L.P., and Carlyle-IT International Partners II, L.P., made through their general partner, T.C. Group, L.L.C. (*Id.* at PP 18-20, PP 22-23, P 31.) In return for the $ 45 million in investments, the Carlyle Defendants received 45,000 shares {*6} of 6% Cumulative Convertible Participating Preferred Stock and detachable warrants to purchase 1.25 million shares of the IT Group's common stock. (*Id.* at P 31.)

"The Carlyle Defendants also received approximately 25% of the IT Group's voting power and obtained the right to elect a majority of IT Group's board of directors ... ." (*Id.*) The IT Group Proxy Statement n4 dated May 20, 1999 shows that, prior to 1999, the Carlyle Defendants elected five of the nine members of the IT Group's board. (D.I. 39, Ex. D at A-0024.) More particularly, from 1996 to 1999, the Carlyle Defendants filled five of nine IT Group board positions by electing defendants D'Aniello, Dolan, Gibson, Pugliese, and Watkins. (*Id.* at A-0025.) Those directors

remained on the IT Group board through 2002. (Complaint, D.I. 30 at P 3, PP 7-9, P 11.)

- - -Footnotes- - -

n4 In reviewing a **12(b)** motion to dismiss in a case such as this, the court may consider a company's SEC filings, as well as other public records. *See In re Delmarva Sec. Litig.*, 794 F. Supp. 1293, 1299 (D. Del. 1992).

- - -End Footnotes- - -
{*7}

As of May 14, 1999, the IT Group increased the size of its board to eleven directors. (D.I. 39, Ex. D at A-0024.) The board nominated defendant Harvey to fill one of the two new board seats (*id.*), and he was promptly elected (Complaint, D.I. 30 at P 4.) He too remained on the board through 2002. (*Id.*) The Carlyle Defendants declined to exercise their right to elect the eleventh director, thus leaving the board with ten members, five of whom were elected by the Carlyle Defendants. n5 (D.I. 39, Ex. D at A-0024.)

- - -Footnotes- - -

n5 In addition to the election rights associated with their investment, "the Carlyle Defendants procured a consulting agreement ... pursuant to which they were paid $ 100,000.00 per year and $ 10,000.00 per month." (Complaint, D.I. 30 at P 31.)

- - -End Footnotes- - -

Four of those ten directors had additional connections to the Carlyle Defendants. D'Aniello "has been a Managing Director of The Carlyle Group since at least 1987" and was also the Managing Director of TCG Holdings, L.L.C. and a Managing Member of TC Group, {*8} L.L.C. (*Id.* at P 3.) Dolan "has been employed by The Carlyle Group since at least 1989." (*Id.* at P 7.) "In 1998, Dolan became a Principal of The Carlyle Group, and in February 2001, he became a Managing Director of The Carlyle Group." (*Id.*) Harvey, along with D'Aniello, served on the boards of directors of other companies that are owned or controlled by The Carlyle Group. (*Id.* at PP 3-4.) Finally, Watkins "served as director of Duratek, Inc. of which the Carlyle Defendants are the majority shareholder." (*Id.* at P 11.)

Plaintiff alleges that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (*id.* at P 31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14).

B. The Roll-Up Strategy

According to Plaintiff, "as of 1998, the IT Group had experienced consecutive fiscal years in which it had lost money." (*Id.* at P 42.) The Carlyle Defendants, "through [their] control of the board of directors of the IT Group, adopted and implemented a purported 'Roll-Up Strategy' to grow the company by acquiring companies engaged in the same or similar lines of business. {*9} " (*Id.* at P 32.) From 1998 to 2000, the IT Group "acquired at least eleven companies" as part of this strategy. (*Id.*) In five of those acquisitions, the IT Group paid approximately $ 526 million and booked goodwill n6 of approximately $ 515.5 million. (*See id.* at PP 33-37.) In a sixth acquisition, the IT Group paid approximately $ 1 million, along with contingent consideration of up to $ 8 million, and booked goodwill of approximately $ 5.5 million. (*Id.* at P 38.) "By or about the end of 2000, the IT Group had booked aggregate [goodwill] of approximately $ 539 million, representing 41 percent of the IT Group's total assets." (*Id.* at P 39.) Plaintiff asserts that the goodwill booked in these transactions was "of no value to the IT Group," and that consequently, "the value of the IT Group's assets was substantially less than the values reflected on its books." (*Id.* at P 41.)

- - -Footnotes- - -

n6 "Goodwill" is defined in the Complaint as the "Cost in excess of net assets of the acquired businesses." (Complaint, D.I. 30 at P 39.)

- - -End Footnotes- - -
{*10}

C. The IT Group's Insolvency

The Roll-Up acquisitions between 1998 and 2000 "were funded largely by debt financing ... including approximately $ 500 million in secured loans and credit facilities ... and approximately $ 255 million in subordinated bond debt issued in 1999." (*Id.* at P 43.) This financing "increased the Company's leverage, increased its interest payments, and strained [its] liquidity." (*Id.* at P 44.) To deal with this lack of liquidity, the IT Group obtained an additional $ 100 million term loan in March 2000. (*Id.* at P 45.) Its "average debt outstanding during 2000 was approximately $ 650 million." (*Id.*)

"In March 1997, the Company reported approximately $ 360 million in revenues and total liabilities of approximately $ 172 million ... ." (*Id.* at P 44.) "By December 2000, [it] reported approximately $ 1.4 billion in revenues, while total liabilities had ballooned to approximately $ 1 billion ... ." (*Id.*) "For the period ended [sic] March 28, 1997", the IT Group had a tangible net worth of approximately $ 160 million. By the period end of December 2000, the IT Group had a tangible net worth of approximately negative $ 277 million. {*11} " (*Id.* at P 46.) Plaintiff alleges that, "beginning as early as March 1998, the IT Group was insolvent or within the vicinity of insolvency." (*Id.* at P 47.)

Finally, on January 16, 2002, the IT Group filed for bankruptcy protection. (*Id.* at P 57.) "Thereafter, the IT Group was liquidated." (*Id.*)

D. Allegations Regarding the Board's Actions and Failures to Act

Plaintiff alleges that, in addition to following the unwise Roll-Up Strategy, the IT Group directors and officers also "failed to take prompt and prudent actions to preserve and maximize [the IT Group's] assets and to restructure its debts" (*id.* at P 50), "failed to retain financial asset divestiture consultants, financial consultants, turnaround and restructuring consultants, or bankruptcy and legal counsel" (*id.* at P 51), and "failed to inform themselves of all material information available to them concerning financial restructuring" (*id.* at P 52). According to Plaintiff, those failures "caused or deepened [the IT Group's] insolvency, and sealed [its] financial doom." (*Id.* at P 55.) Because, Plaintiff says, the IT Group board was under the control of the Carlyle Defendants (see {*12} *id.* at P 14, P 31), those failures are also the Carlyle Defendants' failures (*see id.* at P 1). In Counts I-IV, Plaintiff alleges that those failures amount to waste of corporate assets and to breaches of the Defendants' fiduciary duties to the IT Group and its creditors. (*Id.* at PP 58-75.) Count V alleges that the Carlyle Defendants also aided and abetted the other Defendants' breaches. (*Id.* at PP 76-79.)

Plaintiff further asserts that, while controlling the IT Group, the Carlyle Defendants were paid in excess of $ 850,000 from consulting agreements with the Company and in excess of $ 8.9 million in dividends from their preferred stock in the Company. (*Id.* at P 1.) Plaintiff particularly describes dividend payments to the Carlyle Defendants of $ 1,362,254 in 1998 (*id.* at P 99), $ 2,765,700 in 1999 (*id.* at P 101), $ 2,765,700 in 2000 (*id.* at P 102), and $ 2,074,275 in 2001 (*id.* at P 103), all of which are alleged in Counts VII and VIII to be fraudulent transfers (*id.* at PP 97-115) and, in Count IX, to be unlawful payments of dividends (*id.* at PP

116-18). Plaintiff also lists other payments made to particular Defendants, including the Carlyle {*13} Defendants, within the year before the bankruptcy petition (*id.* at PP 82-88) and which are alleged, in Count VI, to be avoidable preferential transfers (*id.* at PP 80-96) and, in Count VIII, to be fraudulent transfers (*id.* at PP 109-115).

Plaintiff alleges, again in Counts I-IV, that those payments to insiders, made while the IT Group was insolvent or in the vicinity of insolvency, are additional instances of corporate waste and breach of fiduciary duties. (*Id.* at P 61(g), P 65(g), P 69(f), P 74(g).) Also, those payments and the increased debt burden were allegedly part of a strategy to "artificially extend[] the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id.* at P 61(h), P 65(h), P 69(g), P 74(h).) Count V alleges that the Carlyle Defendants aided and abetted those breaches as well. (*Id.* at PP 76-79.)

The claims in this case were originally asserted by the Official Committee of Unsecured Creditors in the IT Group bankruptcy proceeding. (D.I. 36 at 1.) By stipulation of the parties and pursuant to the First Amended Joint Chapter 11 Plan for the IT Group, which was confirmed on April 5, 2004 (D.I. 52 at {*14} 6, D.I. 53 at A003-A062), the IT Litigation Trust was substituted as Plaintiff in this action.

## III. STANDARD OF REVIEW

A challenge to subject matter jurisdiction under **Fed. R. Civ. P. 12(b)(1)** requires a court to ask "whether the complaint alleges facts on its face which, if taken as true, would be sufficient to invoke the district court's jurisdiction." *FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996).*

**Fed. R. Civ. P. 12(b)(6)** requires a court to accept as true all material allegations of the complaint. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998).* "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).*

A complaint {*15} must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." **Fed. R. Civ. P. 8(a).** The Federal Rules "do not require a claimant to set out in detail the facts upon which he bases his claim," *Leatherman v. Tarrant County Narcotics Intelligence &*

*Coordination Unit,* 507 U.S. 163, 168, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993), and "a plaintiff will not be thrown out of court on a **Rule 12(b)(6)** motion for lack of detailed facts." *Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 237 (3d Cir. 2005). Still, a plaintiff must allege the supporting facts "necessary to provide the defendant fair notice of the plaintiff's claim and the 'grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

## IV. DISCUSSION

A.  The  Motion  Challenging  Subject  Matter Jurisdiction

The federal district courts have subject matter jurisdiction over bankruptcy cases pursuant to **28 U.S.C. § 1334.** That statute provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11," and "original but not {*16} exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." § 1334(a), (b). "Cases under title 11, proceedings arising under title 11, and proceedings arising in a case under title 11 are referred to as 'core' proceedings; whereas proceedings 'related to' a case under title 11 are referred to as 'non-core' proceedings." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.),* 372 F.3d 154, 162 (3d Cir. 2004). It is conceded that none of the state law claims in Counts I-V and IX qualify as core proceedings. The motion to dismiss for lack of subject matter jurisdiction thus centers on the question of whether these claims are non-core claims falling within the category of "related to" jurisdiction.

"With 'related to' jurisdiction, Congress intended to grant bankruptcy courts comprehensive jurisdiction so that they could deal efficiently and expeditiously with matters connected with the bankruptcy estate." *Id.* at 163-64 (internal citations omitted). Prior to the confirmation of a bankruptcy plan, a proceeding will fall under "related to" jurisdiction if "the outcome of that proceeding {*17} could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984). But the test must be formulated somewhat differently for proceedings that arise post-confirmation, because "at the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute." *Resorts,* 372 F.3d at 165. After plan confirmation, a proceeding will be within the "related to" jurisdiction if it has a "close nexus to the bankruptcy plan." *Id.* at 166. "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* at 167.

Here, Defendants argue that, for two reasons, the state law claims do not have a close nexus to the confirmed IT Group plan. First, they say, because the IT Group estate no longer exists after plan confirmation, this lawsuit can have no effect on the estate. (D.I. 36 at 11.) Instead, any proceeds will be distributed by Plaintiff to the beneficiaries of the Litigation Trust. Second, Defendants argue that {*18} resolving the state law claims requires no construction, interpretation, or implementation of the plan. (*Id.* at 11-12.) Rather, the only connection to the bankruptcy "is that a recovery by the Plaintiff might increase the assets of the Litigation Trust and its beneficiaries," and that connection, on its own, is insufficient to support "related to" jurisdiction. (*Id.* at 13 (citing *Resorts,* 372 F.3d at 170).) Thus, Defendants conclude, this court does not have subject matter jurisdiction over Counts I-V and IX.

The Defendants' reasoning, however, depends upon an overstatement of the Third Circuit's conclusions in *Resorts.* First, no one disputes that the IT Group estate no longer exists, but that fact alone is not determinative. Indeed, the "close nexus" test was formulated to address jurisdiction over claims arising post-confirmation, recognizing that a literal interpretation of the *Pacor* test would end the court's jurisdiction when the plan was confirmed. *Id.* at 165-67. Thus, jurisdiction may be proper, even after confirmation of the bankruptcy plan.

Second, unlike the cause of action in *Resorts,* which arose nearly seven years {*19} after confirmation and was a malpractice claim by the litigation trust against its accountant, Plaintiff's cause of action in this case arose before the filing of the bankruptcy petition, and the losses claimed by Plaintiff on behalf of unsecured creditors are logically connected to the IT Group insolvency and subsequent bankruptcy. Furthermore, this cause of action was assigned to Plaintiff by Section 7.16 of the IT Group bankruptcy plan. (D.I. 53 at A034.) The assignment in a confirmed plan of a prepetition cause of action "could well establish the 'close nexus to the bankruptcy plan or proceeding' which the Third Circuit requires." *Michaels v. World Color Press, Inc. (In re LGI, Inc.),* 322 B.R. 95, 102 (Bankr. D.N.J. 2005). While resolving Plaintiff's state law claims may not require construction or interpretation of the plan, this proceeding "plainly serves the plan through the implementation, consummation, and execution which typify many post-confirmation matters." *Id.* Exhibit 1 of the confirmed plan includes within the listing of claims assigned to Plaintiff "any claims for acts or omissions of [the IT Group's] . . . present and former officers, directors, {*20} insiders and accountants." (D.I. 53 at A052.) The present claims are within that

category, and their pursuit was therefore contemplated by the plan itself.

Thus, contrary to Defendants' position, the possible increase in Plaintiff's assets is not the only connection to the IT Group bankruptcy. Because this matter affects the implementation, consummation, and execution of the bankruptcy plan, there is a close nexus to the bankruptcy sufficient to satisfy the standard set in *Resorts*. **372 F.3d at 166-67.** I therefore conclude that the state law claims in Counts I-V and IX are properly within the "related to" jurisdiction granted under § 1334. n7

- - -Footnotes- - -

n7 Because of that conclusion, I need not address the parties' arguments concerning supplemental jurisdiction under **28 U.S.C. § 1367.**

- - -End Footnotes- - -

B. The **12(b)(6)** Motion to Dismiss

1. Counts I, II, and IV - Breach of Corporate Fiduciary Duty Claims Against the Directors, Officers, and Carlyle Defendants

As earlier noted, *supra* note {*21} 2, Plaintiff alleges in Count I that the IT Group directors and officers breached their duties of loyalty and due care to the Company and its creditors. In Count II, Plaintiff makes the same allegations against the directors and officers under the "Trust Fund" doctrine, n8 based on the IT Group's alleged insolvency. In Count IV, Plaintiff alleges that the Carlyle Defendants breached duties of loyalty and due care that they owed because of their alleged control over the IT Group board. Defendants attack the sufficiency of the pleading of all of those counts. Since the allegations in Counts I, II, and IV are nearly identical, I treat them as a group in the following discussion, dealing first with the duty of loyalty claims and then with the duty of care claims. I conclude that the Complaint adequately states claims for breaches of the duty of loyalty by the directors and Carlyle Defendants, but that all other claims for breach of fiduciary duties must be dismissed.

- - -Footnotes- - -

n8 Under the Trust Fund doctrine, "the directors [of an insolvent corporation] become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets." *Prod. Res. Group, L.L.C.*

*v. NCT Group, Inc.,* **863 A.2d 772, 791 (Del. Ch. 2004).**

- - -End Footnotes- - -
{*22}

a. Duty of Loyalty

Two of the ten separate breaches alleged in each of Counts I, II, and IV are identifiable as breaches of the duty of loyalty. First, the Defendants allegedly made "transfers for the benefits [sic] of insiders." (Complaint, D.I. 30 at P61(g), P65(g), P74(g).) Second, the Defendants "artificially extended the life of the insolvent Company to obtain a return on the Carlyle Defendants' equity investment." (*Id* at P61(h), P65(h), P74(h).) These claims are apparently based on the payments made to Defendants, including the dividends paid to the Carlyle Defendants, while the IT Group was losing money and unable to service its debt. I will discuss in turn the claims against the directors, the officers, and the Carlyle Defendants.

i. Directors

Under Delaware law, a director's duty of loyalty "imposes an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Belcom, Inc. v. Robb,* **1998 Del. Ch. LEXIS 58, No. CIV.A. 14663, 1998 WL 229527, at \*3 (Del. Ch. 1998)** (citing *Guth v. Loft,* **23 Del. Ch. 255, 5 A.2d 503, 510 (Del. 1939)).** While each {*23} director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company," *Aronson v. Lewis,* **473 A.2d 805, 812 (Del. 1984),** n9 unless the plaintiff shows that the presumption does not apply. A plaintiff can avoid the presumption for a particular transaction by showing "that a majority of a board that approved the transaction in dispute was interested and/or lacked independence." *Orman v. Cullman,* **794 A.2d 5, 23 (Del. Ch. 2002).** A director is interested when appearing on both sides of a transaction or when deriving a personal benefit from a transaction that is not received by stockholders generally. *See Aronson,* **473 A.2d at 812;** *Orman,* **794 A.2d at 23.** "Independence means that a director's decision is based on the corporate merits of the subject ... rather than extraneous considerations or influences." *Aronson,* **473 A.2d at 816.** A lack of independence arises when "directors are 'beholden' to [the controlling {*24} person] or so under their influence that their discretion

would be sterilized." *Orman,* **794 A.2d at 24** (quoting *Rales v. Blasband,* **634 A.2d 927, 936 (Del. 1993)).**

- - -Footnotes- - -

n9 While *Aronson* was a "classic Delaware derivative case," *Tower Air,* **416 F.3d at 236 n.10,** citing it, along with other derivative cases, for propositions of substantive Delaware law concerning the business judgment rule is proper. *Cf. id.* at **238** (citing *Aronson* for definition of the business judgment rule).

- - -End Footnotes- - -

Here, Plaintiff's claims are based on payments made to insiders, and the Complaint describes payments made both to the Carlyle Defendants and to individual defendants. The board allegedly made payments to the Carlyle Defendants pursuant to a consulting agreement and as dividends arising from the preferred stock. (*Id.* at Pl, PP99-103.) The directors were not interested in those payments because no director is alleged to have received a personal benefit. However, Plaintiff {*25} appears to allege that the directors lacked independence concerning those payments, because of the Carlyle Defendants' influence. To successfully avoid the business judgment rule presumption, Plaintiff will have to show that directors were "beholden to [the Carlyle Defendants] or so under their influence that their discretion would be sterilized." *Orman,* **794 A.2d at 24.** For the allegations to survive this Motion, Plaintiff must allege the supporting facts "necessary to provide the [Defendants] fair notice of the [Plaintiff's] claim and the 'grounds upon which it rests.'" *Tower Air,* **416 F.3d at 237** (quoting *Conley,* **355 U.S. at 47).**

Four of the ten directors in place between 1999 and 2002, defendants D'Aniello, Dolan, Harvey, and Watkins, had other connections to the Carlyle Defendants, and two of those, D'Aniello and Dolan, were Managing Directors of The Carlyle Group. (*Id.* at PP3-4, P7, P11.) Two other directors, defendants Gibson and Pugliese, were elected by the Carlyle Defendants. (D.I. 39, Ex. D at A-0025.) Thus, before 1999, five of nine directors were elected by the Carlyle Defendants. (*See id.*) After 1999, five {*26} of ten directors were elected by the Carlyle Defendants (*see id.*), and a sixth director, Harvey, allegedly had other connections to the Carlyle Defendants (Complaint, D.I. 30 at P4). These alleged connections would not be sufficient on their own to prove that these six directors lacked independence. *See Aronson,* **473 A.2d at 816** ("It is not enough to charge that a director was nominated or elected at the behest of those controlling

the outcome of a corporate election. That is the usual way a person becomes a corporate director.") Nor do they show anything about the remaining director defendants, McGill, Pogue, Schmidt, and DeLuca.

Thus, the claim of a lack of independence is based largely on the allegations that the Carlyle Defendants "took control" of the IT Group in or around November 1996 (Complaint, D.I. 30 at P31), and that "at all relevant times, the Carlyle Defendants possessed and exercised control over the IT Group" (*id.* at P 14). Actual control of the IT Group's operations by the Carlyle Defendants, if proved, would support a conclusion that some or all of the directors lacked independence concerning payments made to the Carlyle Defendants. Thus, while {*27} I seriously doubt that the conclusory allegations of control in the Complaint would survive a **12(b)(6)** motion in the Delaware Court of Chancery, they do put Defendants on notice that the claim here is based on the Carlyle Defendants' actual control of the IT Group and the lack of independence of the directors concerning payments to this controlling group. Given that the Third Circuit has emphasized the view that the Federal Rules of Civil Procedure do not require a plaintiff to plead detailed facts to make out a claim for breach of fiduciary duties under Delaware law, *Tower Air,* **416 F.3d at 236-39,** I am bound to hold that the Plaintiff's allegations are sufficient in this case. n10

- - -Footnotes- - -

n10 A lengthy digression here will, I hope, be excused. The Third Circuit noted in *Tower Air,* **416 F.3d at 236-37** & n.11, that when a state procedural rule conflicts with an on-point Federal Rule of Civil Procedure, a federal court should apply the Federal Rule. *See Hanna v. Plumer,* **380 U.S. 460, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)** (applying the federal standard for service of process). That proposition is beyond dispute. However, the Delaware requirement that there be more than conclusory allegations to support fiduciary duty claims does not appear to me to be simply a matter of procedure. Rather, the pleading requirements shape the substance of fiduciary duty claims by enforcing the business judgment rule, which is fundamental to Delaware corporate law.

{*28}

The business judgment rule reflects the understanding that the directors of a corporation are entrusted with that

corporation's management, and that directors cannot guarantee the success of their decisions. Thus, "in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith." *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch. 1996).

This rule is a matter of substantive corporate law. *See Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del. 1989) ("The [business judgment] rule operates as both a procedural guide for litigants and a substantive rule of law.") First, it prevents the courts from second-guessing the decisions of directors and officers based on results of those decisions rather than on the care, loyalty, and good faith of the directors making the decision. Thus, the rule keeps courts from "injecting themselves into a management role for which they were neither trained nor competent." *Weiss v. Temporary Inv. Fund,* 692 F.2d 928, 941 (3d Cir. 1982). Second, the business judgment rule protects "against a threat of sub-optimal risk acceptance." *Gagliardi,* 683 A.2d at 1052. As a policy matter, directors should not be overly risk averse. "Shareholders' investment interests, across the full range of their diversifiable equity investments, will be maximized if corporate directors and managers honestly assess risk and reward and accept for the corporation the highest risk adjusted returns available that are above the firm's cost of capital." *Id.* Imposing liability for corporate losses on directors and officers will tend to deter them from seeking this optimum level of risk.

{*29}

To implement the business judgment rule, the substance of Delaware corporate law induces a presumption that, absent self-interest or lack of independence, "the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984). The plaintiff "may prevent the application

of the business judgment rule with well-pleaded facts establishing that the directors acted out of self-interest," and "in order to overcome the presumption of the business judgment rule [the plaintiff] must allege with particularity facts which establish that the 'contested decision was not a product of valid business judgment." *In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F. Supp. 1119, 1132 (D. Del. 1988) (citing *Grobow v. Perot,* 539 A.2d 180, 187 (Del. 1988); *Aronson,* 473 A.2d at 812); *see also Crescent/Mach I Partners L.P. v. Turner,* 846 A.2d 963, 984 (Del. Ch. 2000) ("In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule."); *Ash v. McCall,* 2000 Del. Ch. LEXIS 144, No. CIV.A.17132, 2000 WL 1370341, at *10 (Del. Ch. Sept. 15, 2000) ("This Court has stated on several occasions that mere allegations that directors made a poor decision ... [do] not state a cause of action ... .").

{*30}

Having been taken to task once for citing derivative suit precedents in a direct action, *Tower Air,* 416 F.3d at 236 ("The District Court (mistakenly) cited derivative suit pleading cases ... ."), I hasten to note that, as on that earlier occasion, I cite the foregoing cases not under some confusion that this is a derivative suit but for the specific point they make about the protections of the business judgment rule. Those protections are a substantive point of law that, I believe, stands largely independent both of the procedural distinction between direct and derivative actions, *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb,* 385 F. Supp. 2d 449, 457 & n.6 (D. Del. 2004), and of the notice purpose inherent in procedural rules of pleading, *Stanziale v. Nachtomi,* 2004 U.S. Dist. LEXIS 15664, No. CIV.A.01-403, 2004 WL 1812705, at *2 (D. Del. Aug. 6, 2004). In sum, though the Third Circuit apparently views the requirement for pleading facts in a context like this as a peculiarity of Delaware procedural law, *see Tower Air,* 416 F.3d at 236-37 ("Delaware courts consider

Chancery Rule 8 specificity requirements as consonant with notice pleading, but such notice pleading bears scant resemblance to the federal species.") (citation omitted), it appears to me to be instead an implementation of the substantive presumption of the business judgment rule. This is true even though the standard of pleading "particularized" facts may be more stringent in a derivative action, governed by **Rule 23.1**, than in a direct action being challenged under **Rule 12(b)(6)**. *Cf. Telxon Corp. v. Bogomolny*, **792 A.2d 964, 974 (Del. Ch. 2001)** (stating that the "high burden of pleading with particularity facts supporting the reasonableness" of the alleged claims required to withstand a motion to dismiss under **Rule 23.1** "is somewhat lower" under **Rule 12(b)(6)**). My understanding is that, even in the latter circumstance, sufficient factual specificity must be included in the complaint to raise a rational inference that the duty in question has been breached. The Third Circuit may be correct that this approach bears "scant resemblance" to simple notice pleading, but the difference is an entirely deliberate decision of substantive Delaware law, not a procedural peccadillo.

{*31}

The *Tower Air* holding requires directors to face greater expense and risk in a federal court than they would in state court, because plaintiffs in a bankruptcy adversary proceeding can now more easily survive a **Rule 12(b)(6)** motion and therefore will have easier access to litigation and the opportunity to impose the burdens of litigation on corporate officials. This result is troubling for at least three reasons. First, and most fundamentally, if I am correct that we are dealing with substantive law here, the *Tower Air* approach creates a disparity between state and federal courts of the type condemned in *Erie R.R. Co. v. Tompkins*, **304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)**. The outcome of an application of Delaware corporate law ought not turn on whether one is appearing in the Delaware Court of Chancery or a federal district court.

Second, as a matter of public policy, it makes little sense to expand the risk of directors and officers simply because a corporation is insolvent. This case is brought as a direct rather than a derivative action solely because the IT Group became insolvent and its board was displaced by a bankruptcy trustee. As the Delaware Chancery Court has rightly noted, "it would be puzzling if, in insolvency, the equitable law of corporations expanded the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, **863 A.2d 772, 794 (Del. Ch. 2004)**.

{*32}

Third, the approach dictated by the Third Circuit in *Tower Air* does not merely make particularized pleading unnecessary; it actively penalizes it and, instead, rewards obscurity. Calling the business judgment rule presumption an affirmative defense, the Court of Appeals stated, "generally speaking, we will not rely on an affirmative defense . . . to trigger dismissal of a complaint under **Rule 12(b)(6)**." *Tower Air,* **416 F.3d at 238**. It went on to say, however, that where the plaintiff mentions an affirmative defense in the complaint, that defense can be a basis of dismissal. *Id.* Thus, plaintiffs are given a powerful and perverse incentive to "dummy-up" about the obvious implications of the business judgment rule when drafting their complaints in the first instance. Any plaintiff unwise enough to actually allude to the rule "must plead that he overcomes the presumption created by that rule." *Id.* Since the standard to be applied is the notice pleading standard of **Federal Rule of Civil Procedure 8**, a pleading will not be insufficient for failure to include particularized facts. But it can be "self-defeating" by giving such facts, if they offer "an ostensibly legitimate business purpose for an allegedly egregious decision."*Id.* **at 239**. In short, because the Third Circuit sees a problem not when facts are omitted but only when they are presented, *see id.* ("The problem ... is not the facts that are not pleaded, but the facts that are."), the predictable and unfortunate result will be deliberately

obtuse allegations. That is an outcome that truly bears scant resemblance to the operation of the business judgment rule in Delaware courts.

{*33}

To conclude, the business judgment rule's presumption is a matter of substantive Delaware law. The *Tower Air* opinion requires me to apply a pleading standard far weaker than what I believe to be the Delaware requirement for pleading facts to overcome that presumption. I am uncomfortable changing the scope of Delaware fiduciary duty claims by weakening a substantive presumption, but, given the ruling in *Tower Air* and the lack of any Delaware authority directly stating that the *Tower Air* approach contravenes Delaware law, I must yield to the Third Circuit's interpretation.

- - -End Footnotes- - -

In Count VI, discussed below in Section IV.B.4, Plaintiff also describes payments made to individual directors. (Complaint, D.I. 30 at PP81-87.) None of the fiduciary duty counts point specifically to those payments, which are only mentioned later in Count VI, and Plaintiff may not have intended them to form the basis for fiduciary duty claims. But even if Plaintiff intended to include them in the "transfers to insiders" alleged in Counts I and II, the allegations concerning those payments are insufficient to meet {*34} even notice pleading requirements. Plaintiff alleges nothing other than the amounts and that the payments were made in satisfaction of antecedent debts and are avoidable preferences under Bankruptcy Code. (*See id.* at PP81-87, P92.) No other information is given about the nature of the payments or the antecedent debts. Importantly for any fiduciary duty claims, the board is not alleged to have made any decision or acted in any way concerning those payments. And again, Plaintiff does not give notice in the Complaint that the payments to individual directors, mentioned only in Count VI, were intended to form the basis for claims in Counts I and II. Thus, even though particularized fact pleading is not required, the Complaint fails to give any satisfactory notice of a fiduciary duty claim based on those payments to individual directors.

Therefore, the Complaint states a claim against the directors for breach of their duty of loyalty in approving payments to the Carlyle Defendants and artificially extending the life of the Company to continue making those payments. Those two aspects of

Counts I and II, as asserted against the directors, survive this Motion.

ii. Officers

Counts {*35} I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were made against the directors. Defendant Soose is the only officer named in the Complaint who was not also a director, but the Complaint alleges nothing about Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Soose is not alleged to have benefitted from any payments or to have been involved in the decisions to make payments. Therefore, the duty of loyalty claims in Counts I and II must be dismissed as to Soose.

The only other officer mentioned in the Complaint, DeLuca, was also a director during the alleged events. (*See id.* at P12.) Since no allegations are made against DeLuca based on his actions as an officer separate from those he supposedly took as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.1.a.i.

iii. Carlyle Defendants

Under Delaware law, a shareholder will owe fiduciary duties to a corporation, including the duty of loyalty, "only if [that shareholder] owns a majority {*36} interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp. (In re Newmont Mining Corp. S'holders Litig.),* 535 A.2d 1334, 1344 (Del. 1987). A dominating shareholder may, therefore, be subject to a claim for breach of a duty of loyalty, if that shareholder stands on both sides of a transaction.

Here, the issue is not whether the Carlyle Defendants were interested in the transactions that resulted in payments made to them. Obviously, they were; they derived a personal benefit that was not received by stockholders generally. *Aronson,* 473 A.2d at 812. The issue as to the Carlyle Defendants is whether they owed any fiduciary duties to the Company at all, i.e., whether they were controlling shareholders of the IT Group. As for the claims against the directors concerning the payments to the Carlyle Defendants, those claims depend on the allegations of actual control by the Carlyle Defendants over the IT Group directors. (*See* Complaint, D.I. 30 at P14, P31.) If Plaintiff can prove that the Carlyle Defendants exercised such control, then they owed fiduciary duties to the Company, and, as interested {*37} fiduciaries, may be liable on a duty of loyalty claim.

As discussed regarding the claims against the directors, *supra* Section IV.B.1.a.i, the allegations of control and self-interest put Defendants, including the Carlyle Defendants, on notice of Plaintiff's claim, satisfying the pleading standard set forth in *Tower Air*. The duty of loyalty claims set forth against the Carlyle Defendants in sections (g) and (h) of Count IV therefore survive the Motion to Dismiss for failure to state a claim. n11

- - -Footnotes- - -

n11 Count IV actually alleges that the directors and officers breached various fiduciary duties, revealing that the allegations from Counts I and II were simply pasted into a count against the Carlyle Defendants. (*See* Complaint, D.I. 30 at P74.) However, the title indicates that Count IV is intended to make allegations against the Carlyle Defendants, and so I treat the Complaint as fairly making those allegations.

- - -End Footnotes- - -

b. Duty of Care

The remaining eight breaches alleged in Counts I, II, and IV are breaches {*38} of the duty of care. Plaintiff alleges that Defendants: first, "failed to inform themselves of all material information readily available to them," (Complaint, D.I. 30 at P61 (a), P65(a), P74(a)); second, "incurred Acquisitions for more than the fair value of such Acquisitions and increased the Company's debts through such Acquisitions," (*id.* at P61(b), P65(b), P74(b)); third, "deepened the Company's insolvency," (*id.* at P61(c), P165(c), P74(c)); fourth, "failed to preserve, maximize, and not dissipate the assets for the benefit of the Company and its creditors." (*id.* at P61(d), P65(d), P74(d)); fifth, "knowingly or recklessly ignored facts of, [sic] the Company's insolvency, that it was in the vicinity of insolvency, and was inadequately capitalized," (*id.* at P61(e), P65(e), P74(e)); sixth, "pursued a 'Roll-Up Strategy' long after they knew or should have known it was a failure," (*id.* at P61(f), P65(f), P74(f)); seventh, "failed to timely retain restructuring advisors in order to fully inform themselves of their duties and to take steps necessary and appropriate to maximize the value of the Company for its creditors," (*id.* at P61(1), P65(i), P74(1)); and {*39} eighth, "wasted corporate assets," (*id.* at P61(j), P65(j), P(74(j)). Again, the claims against the directors, the officers, and the Carlyle Defendants are discussed in turn.

i. Directors

Directors must "inform themselves ... of all material information available to them [and] ... must then act with requisite care in the discharge of their duties." *Aronson*, 473 A.2d at 812. The duty of care claims n12 must be dismissed, however, because the IT Group's Certificate of Incorporation contains an exculpation provision that states:

> A director of this Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such limitation of liability is prohibited by the Delaware General Corporation Law as the same exists or may hereafter be amended.

(D.I. 39 at A-0028.) This provision was adopted pursuant to § 102(b)(7) of Delaware's General Corporation Law, 8 *Del. Code* § 102(b)(7), which provides:

The certificate of incorporation may ... contain ... (7) A provision eliminating or limiting the personal liability {*40} of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders: (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law; (iii) under § 174 of this title: or (iv) for any transaction from which the director derived an improper personal benefit.

The exculpatory provisions of § 102(b)(7) apply to claims brought by creditors of an insolvent corporation. *Prod. Res. Group, L.L.C: v. NCT Group, Inc.,* 863 A.2d 772, 793-95 (Del. Ch. 2004). Once the § 102(b)(7) provision is raised against duty of care claims, that is "the end of the case." *Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del. 2001). n13

- - -Footnotes- - -

n12 To the extent that these allegations relate to the payments to insiders or to the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, Section IV.B.1.a. Read in the light most favorable to Plaintiff, the remaining duty of care claims allege, in parts (b)-(d), (f), and (j), poor

decision-making concerning the Roll-Up acquisitions, and, in parts (a), (e), and (i), a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt.

- - -End Footnotes- - -
{\*41}

- - -Footnotes- - -

n13 The Third Circuit declined to address an exculpatory charter provision in *Tower Air,* because the provision was raised for the first time on appeal. **416 F.3d at 242.** The Delaware Supreme Court held in reviewing a **12(b)(6)** motion that, white a § **102(b)(7)** clause provides an affirmative defense, "proving the existence of a valid exculpatory provision ... entitles directors to dismissal of any claims ... against them that are based solely on alleged breaches of the board's duty of care." *Malpiede v. Townson,* **780 A.2d 1075, 1095-96 n.71 (Del. 2001).**

- - -End Footnotes- - -

Thus, while the duty of loyalty claims are unaffected, the directors are protected by § **102(b)(7)** against liability for breaching the duty of care. Counts I and II against the directors, to the extent that those counts allege breaches of the duty of care, must therefore be dismissed.

ii. Officers

Again, Counts I and II allege that the IT Group's officers breached their fiduciary duties, based on the same allegations that were {\*42} made against the directors. And again, the Complaint alleges nothing about defendant Soose other than his residence and position with the Company. (*See* Complaint, D.I. 30 at P13.) Because he is not alleged to have taken part in the decisions that form the basis of Plaintiff's complaint, the duty of care claims against Soose in Counts I and II must be dismissed. Therefore, these two counts are dismissed in their entirety as to Soose.

As discussed above, Section IV.B.1.a.ii, defendant DeLuca was a director and an officer. (*See id.* at P12.) Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and

his alleged culpability is covered by the discussion above, Section IV.B.1 .b.i. n14

- - -Footnotes- - -

n14 Even if the Complaint alleged a breach of the duty of care by DeLuca in his capacity as officer, which it does not, such an allegation, like the duty of care allegations against the Carlyle Defendants, would fail to overcome the business judgment rule. *See infra* Section IV.B.1.b.iii.

- - -End Footnotes- - -
{\*43}

iii. Carlyle Defendants

In Count IV, Plaintiff alleges that the Carlyle Defendants have committed the same breaches of fiduciary duties as have the directors and officers, the duties of the Carlyle Defendants arising from control over the IT Group directors. As I noted in the discussion about the directors' alleged breaches, *supra* Section IV.B.1.b.i, these allegations against the Carlyle Defendants, read in the light most favorable to Plaintiff, concern poor decision-making about the Roll-Up acquisitions, and a failure to make informed decisions about the Roll-Up Strategy and the accompanying debt. Again, to the extent that these claims are made concerning the payments to insiders or concerning the deliberate, artificial extension of the IT Group's life during insolvency to recoup the Carlyle Defendants' investments, they are really duty of loyalty claims and have already been discussed, *supra* Section IV.B.1.a.iii. The remaining claims, therefore, center on the failed Roll-Up strategy.

While the § **102(b)(7)** charter provision protects only directors from duty of care claims, to the extent that Plaintiff is seeking to hold the Carlyle Defendants responsible for those {\*44} alleged breaches, the Complaint fails to state a claim. Plaintiff is not required to plead detailed facts, but must still "plead around the business judgment rule." *Tower Air,* **416 F.3d at 238.** Thus, even at the pleading stage, if facts alleged in a complaint show "an ostensibly legitimate business purpose for an allegedly egregious decision," then the complaint fails to state a claim for which relief can be granted. *Id.* **at 239.**

Here, Plaintiff alleges that the Roll-Up Strategy was implemented "to grow the company by acquiring companies engaged in the same or similar lines of business." (Complaint, D.I. 30 at P32.) Further, while the IT Group's debt increased during this time, the

Roll-Up Strategy increased revenues from approximately $ 360 million in 1997 to approximately $ 1.4 billion in 2000. (*Id.* at P44.) While the strategy "did not provide the Company with the desired benefits," (*id.* at P48), the fact that the strategy was implemented to achieve benefits for the Company shows that it had a legitimate business purpose. Thus, the Complaint is "self-defeating," *see Tower Air*, 416 F.3d at 239 ("[A] complaint is self-defeating {*45} when it states an ostensibly legitimate business purpose for an allegedly egregious decision"), to the extent that it claims that implementing the Roll-Up Strategy was a breach of the duty of care. Even if the strategy was unwise in retrospect, it is protected in this case by the presumptions of the business judgment rule.

Therefore, to the extent that Count IV alleges that the Carlyle Defendants breached their duty of care, it fails to state a claim and is dismissed.

2. Count III - Waste of Corporate Assets

In Count III, Plaintiff alleges that the directors and officers have wasted corporate assets through the same actions that are alleged to constitute breaches of their fiduciary duties. (Complaint, D.I. 30 at P69(a)-(h).) For a transaction to amount to waste, it must be "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 362 (Del. Ch. 1998).

a. Directors

Because Plaintiff's allegations of waste mirror those concerning breach of fiduciary duties, they concern two sets of transactions. The first set of transactions {*46} involves payments made to some of the Defendants, including the Carlyle Defendants. Defendants argue that the pleadings are insufficient. As discussed above, *supra* Section IV.B.1.a.i, the Complaint sufficiently alleges that payments were made to the Carlyle Defendants in violation of the directors' duties of loyalty, and the Company is alleged to have received no consideration in return for those multimillion dollar payments. Thus, for claims of waste based on those payments, Defendants have not shown that Count III fails to state a claim.

However, as discussed *supra* Section IV.B.1.a.i, the Complaint fails to state a claim for breach of fiduciary duty based on payments made to individual defendants. Since Count III provides no additional information, the Complaint similarly fails to state a claim for waste based on those payments.

The second set of transactions involves the Roll-Up acquisitions, for which the IT Group allegedly received inadequate consideration. While those acquisitions may appear unwise in retrospect, they do not raise a duty of loyalty question, and so, like the duty of care claims in Counts I and II, the § 102(b)(7) provision protects the directors from {*47} liability for those transactions. *See Green v. Phillips*, 1996 Del. Ch. LEXIS 76, C.A. No. 14436, 1996 WL 342093, at *6-*7 (Del. Ch. June 19, 1996)(holding that a § 102(b)(7) provision protected directors from corporate waste claims based on transactions that did not "bring the directors' loyalty and good faith into question").

Therefore, the claims of corporate waste against the directors based on the payments to the Carlyle Defendants (Complaint, D.I. 30 at P69(f)-(g)) survive the Defendants' 12(b)(6) motion, while the other claims of corporate waste (*id.* at P69(a)-(e), (h)) must be dismissed.

b. Officers

The allegations in Count III mirror those in Counts I and II. And just as Counts I and II make no allegations against defendant Soose, *see supra* Sections IV.B.1.a.ii, IV.B.1.b.ii, Count III likewise makes none, and that count against Soose will be dismissed as well.

Again, since no allegations are made against DeLuca based on his actions as an officer separate from those as a director, he is treated as a director for purposes of the Motion to Dismiss for failure to state a claim, and his alleged culpability is covered by the discussion above, Section IV.B.2.a.

3. Count {*48}    V - Aiding and Abetting Claim Against the Carlyle Defendants

In Count V, Plaintiff alleges that the Carlyle Defendants aided and abetted the other Defendants' breaches of fiduciary duties. To succeed in this claim, Plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of that relationship; and (3) knowing participation by the defendant in the fiduciary's breach." *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 989 (Del. Ch. 2000). While the parties agree that a fiduciary relationship existed between the IT Group directors and officers and the Company, Defendants argue that Plaintiff has failed to allege a breach or the knowing participation in that breach by the Carlyle Defendants. As with the duty of loyalty claims already discussed, Defendants' argument fails.

First, as discussed above, Section IV.B.1.a.i, Plaintiff has adequately alleged a breach of the duty of loyalty by the IT Group directors concerning the payments made to the Carlyle Defendants and artificially

extending the life of the IT Group to keep those payments going. Second, again as earlier discussed, Section IV.B.1.a.iii, the allegations of the Carlyle Defendants' {*49} actual control of the IT Group board are sufficient to survive the **12(b)(6)** motion, and knowing participation could be inferred from that alleged control. Thus, contrary to Defendants' argument, Plaintiff has alleged a breach and the knowing participation in the breach by the Carlyle Defendants, and so Count V adequately alleges that the Carlyle Defendants aided and abetted the directors' breach of their duty of loyalty. By contrast, the duty of care claims in Counts I and II cannot succeed, *see supra* Sections IV.B.1.b.i-ii, and so to the extent that Count V alleges aiding and abetting of those supposed breaches, it too must be dismissed.

4. Count VI - Avoidance Claims Under **11 U.S.C. § 547**

In Count VI, Plaintiff sets out payments made to Gibson, Pogue, Harvey, Pugliese, Schmidt, Watkins, and the Carlyle Defendants that the Plaintiff seeks to avoid as preferential transfers pursuant to **11 U.S.C. §§547(b), 550**. The Complaint lists specific amounts transferred to the mentioned individual defendants and $ 2,076,000 transferred to the Carlyle Defendants. (D.I. 30 at PP82-88.) The Complaint further alleges that the payments were made {*50} within one year of the bankruptcy petition date (*id.* at P81) to creditors (*id.* at P89) who are also insiders (*id.* at P90), that the payments were made on account of antecedent debt (*id.* at P92), were made while the IT Group was insolvent (*id.* at P93), and enabled the listed Defendants to receive more than they would in the circumstances set forth in **11 U.S.C. § 547(b)(5)** (*id.* at P94). Defendants argue that those allegations, which mostly mirror the statutory language in § 547(b), are insufficient and that Count VI must be dismissed.

Defendants base their argument on pleading requirements set out in *TWA, Inc. v. Marsh USA Inc. (In re TWA Inc.),* 305 B.R. 228, 232 (Bankr. D. Del. 2004), and *Valley Media, Inc. v. Borders, Inc. (In re Valley Media),* 288 B.R. 189, 192 (Bankr. D. Del. 2003). Those cases instruct that, "to survive a motion to dismiss," a complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the {*51} transfer." *TWA,* **305 B.R. at 232**; *Valley Media,* **288 B.R. at 192**. Because such information is lacking in the present Complaint, in which the only specific information is the amounts transferred, Defendants conclude that the pleading is inadequate. Further, according to Defendants, the

listing of the payment made to the Carlyle Defendants as a group rather than to each individual entity reduces to guesswork any effort to understand which payments were made to whom.

The pleading standard described in *TWA* and *Valley Media* has sometimes been viewed as inconsistent with the liberal pleading requirements of **Federal Rule of Civil Procedure 8**. *See Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.),* 313 B.R. 370, 373 (Bankr. D. Del. 2004), *Neilson v. Cor Karaffa (In re Webvan Group, Inc.),* 2004 Bankr. LEXIS 270, Adv. Proc. No. 03-54365, 2004 WL 483580, at *2 (Bankr. D. Del. Mar. 9, 2004). It has been rightly observed that, "while plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them {*52} to do so in their initial pleading in all cases . . . [is] inappropriate and unnecessarily harsh." *IT Group,* 313 B.R. at 373. Even though the information listed in *TWA* will eventually need to be proved, "it does not follow that it must be pleaded on pain of dismissal." n15 *Id.* (quoting *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.),* 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003)).

- - -Footnotes- - -

n15 Notably, in *TWA,* the court gave the plaintiff leave to amend and agreed that the articulated standard might need to be relaxed in that case to allow the plaintiff to pursue details in discovery. **305 B.R. at 233-34.**

- - -End Footnotes- - -

Here, Plaintiff has described specific amounts paid to specific Defendants in the Complaint (D.I, 30 at PP82-88), providing more information than did the complaint discussed in *TWA, see* **305 B.R. at 232** ("Within 90 days prior to the Petition Date, Marsh received payments from Debtors of approximately two million {*53} dollars."). Also, even though the Carlyle Defendants are grouped together as receiving a payment of $ 2,076,000 (D.I. 30 at P88), the information is sufficient to give the Defendants notice of the basis of the avoidance claim, given the relationship alleged between the Carlyle Defendants. That is all that **Rule 8** requires. *Conley,* 355 U.S. at 47.

Accordingly, I decline to hold the Complaint to the pleading standard set forth in *TWA* and *Valley Media.* Count VI is sufficient to withstand the motion to dismiss.

5. Counts VII and VIII - Fraudulent Transfer Claims

In Count VII, Plaintiff alleges that the dividend payments made to the Carlyle Defendants were constructively fraudulent transfers that Plaintiff can recover pursuant to **11 U.S.C. §§ 544 and 548**. In Count VIII, Plaintiff alleges that both the dividend payments in Count VII and the payments described in Count VI were actual fraudulent conveyances in violation of **11 U.S.C. § 544** and the Delaware Uniform Fraudulent Transfer Act. Defendants attack both the sufficiency of the pleadings and their timeliness.

First, Defendants argue that Count VII fails to give {*54} fair notice of the basis for alleging a violation of § 544. According to Defendants, the claim (1) lists payments to the Carlyle Defendants as a group rather than individually; (2) fails to specify the relevant state law; (3) fails to specify an "actual creditor" as required by § 544(b); and (4) fails to disclose how the IT Group received less than reasonably equivalent value or fair consideration for those payments.

Reading the Complaint in the light most favorable to Plaintiff, these arguments must fail. First, because the payments were dividends associated with the Carlyle Defendants' preferred stock, grouping the payments together does not force the Defendants to guess about which payments are described or who received them. Second, when read with the allegations in Count VIII, the relevant state law is identified as that of Delaware. Third, "for purposes of **Rule 12(b)(6)**, courts do not generally require a trustee to plead the existence of an unsecured creditor by name." *Pardo v. Avanti Corporate Health Sys. (In re APF Co.)*, **274 B.R. 634, 639 (Bankr. D. Del. 2001)**. In any case, Plaintiff represents the interests of the unsecured creditors that are {*55} beneficiaries of the Litigation Trust. Finally, as discussed above concerning the corporate waste claims, Plaintiff alleges that the IT Group received no consideration for those payments. Thus, Defendants are given fair notice of the basis of the § 544 claim in Count VII.

Next, Defendants argue that the § 548 claim of Count VII is untimely because it seeks to recover payments made more than one year prior to the bankruptcy petition date. The Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the [debtor's] petition." **11 U.S.C. § 548(a)(1)**. The IT Group filed its petition on January 16, 2002, so any transfers made before January 16, 2001 are outside the scope of § 548. Therefore, the § 548 claim for the dividends paid from 1998 to 2000 must be dismissed (*see* Complaint, D.I. 30 at PP99-102), while the claim for payments made

on or after January 16, 2001 (*see id.* at P103) may continue.

As to Count VIII, Defendants argue that the claims for fraudulent conveyances are untimely to the extent that they seek to recover transfers {*56} made before January 28, 2001. Delaware's Uniform Fraudulent Transfer Act provides that:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought . . . within 4 years after the transfer was made or the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.

*6 Del. Code* **§ 1309(1)**. Since the Complaint was filed on January 28, 2005, Defendants argue that any claim for a payment made prior to January 28, 2001 is extinguished. But Plaintiff correctly points out that there is a factual issue concerning when the payments were or could reasonably have been discovered. Therefore, dismissal is inappropriate at the pleading stage.

Accordingly, Counts VII and VIII survive this 12(b)(6) motion, except for the § 548 claims under Count VII for payments made prior to January 16, 2001, which must be dismissed.

6. Count IX - Unlawful Payment of Dividends Claim

In Count IX, Plaintiff alleges that the directors violated § 174 of the Delaware General Corporation Law, **8 Del. Code § 174** {*57}  , by paying dividends to the Carlyle Defendants from 1998 to 2001 while the IT Group was insolvent. *See EBS Litig. LLC v. Barclays Global Investors, N.A.,* **304 F.3d 302, 305 (3d Cir. 2002)** ("If the stock dividend occurred when [the company] was insolvent, or rendered [it] insolvent, it was illegal under Delaware law."). Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency during the time when the dividends were paid and the directors' knowledge of the insolvency. However, those arguments are not well-founded. The Complaint alleges that the IT Group was insolvent or in the vicinity of insolvency as early as March 1998. (D.I. 30 at P47.) Further, the booked goodwill associated with the Roll-Up acquisitions is alleged to have inflated the IT Group's assets. (*Id.* at P41.) Finally, Defendants are alleged to have artificially extended the life of the insolvent IT Group in order to keep making payments to the Carlyle Defendants (*id.* at P61, P65, P69, P74), which is relevant for both the allegations of insolvency and of the directors' knowledge. Again, Defendants have

notice of the basis of Plaintiff's claims, and Count IX therefore {*58}   survives the **12(b)(6)** motion.

## V. CONCLUSION

Accordingly, I will deny the Motion to Dismiss for Lack of Subject Matter Jurisdiction. I will grant the Motion to Dismiss for Failure to State a Claim as to the following:

(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care; (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI; (3) Counts I, II, and III to the extent that they are brought against Defendant Soose; (4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under **11 U.S.C. § 548**.

I will deny the Motion to Dismiss for Failure to State a Claim in all other respects. An appropriate order will issue.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS {*59}   HEREBY ORDERED that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket Item ["D.I."] 35) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is GRANTED as to:

(1) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of care, waste of corporate assets for actions in violation of the duty of care, and aiding and abetting violations of the duty of care; (2) Counts I, II, III, IV, and V to the extent that these Counts allege breaches of the duty of loyalty, waste of corporate assets, and aiding and abetting violations of the duty of loyalty based on the payments to individual defendants listed in Count VI; (3) Counts I, II, and III to the extent that they are brought against Defendant Soose; (4) Count VII to the extent that payments made prior to January 16, 2001 are sought to be recovered under **11 U.S.C. § 548**.IT IS FURTHER ORDERED that Defendants' Motion to Dismiss for Failure to State a Claim (D.I. 37) is DENIED in all other respects.UNITED STATES DISTRICT JUDGE November 15, 2005Wilmington, Delaware

**JOHN OSANITSCH vs. MARCONI PLC,** *et al.*

In re: MARCONI PLC, Debtor. JOHN OSANITSCH, Plaintiff-Appellant, -v- MARCONI PLC; MARCONI ACQUISITION SUB, INC.; MARCONI COMMUNICATIONS, INC.; MARIPOSA TECHNOLOGY CORPORATION, INC., Defendants-Appellees.

Case No. 03-B-11949 (SMB), 06 Civ. 6977 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 6947

January 30, 2007, Decided

January 30, 2007, Filed

**COUNSEL:** {*1} James Jay Seltzer, Timothy D. Murphy, The Law Offices of James Jay Seltzer, Emeryville, CA, for appellant.

Robert N. Michaelson, Jeffrey N. Rich, Kirkpatrick & Lockhart Nicholson Graham LLP, for appellees.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION: OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff-appellant John Osanitsch appeals from an order of the United States Bankruptcy Court for the Southern District of New York (the Honorable Stuart M. Bernstein, Chief United States Bankruptcy Judge), dismissing for lack of jurisdiction an adversary proceeding he brought against defendants-appellees Marconi PLC and three affiliated companies. The judgment will be vacated and the case remanded to the Bankruptcy Court.

**BACKGROUND**

John Osanitsch was an executive at defendant Mariposa Technology, Inc. ("Mariposa"), a California telecommunications company, when Mariposa was acquired by defendant Marconi PLC, a British entity. Osanitsch continued to work for Marconi until December 2001. In a dispute over severance benefits to which he claims entitlement, Osanitsch charges that Marconi and the other defendants are guilty of fraud {*2} and breach of contracts.

Unfortunately, Marconi took no legal action on these claims until December 30, 2004. By that time, Marconi had gone bankrupt, and had entered a "Scheme of Arrangement" ("Scheme") -- roughly equivalent to a plan of reorganization in an American bankruptcy proceeding -- that was approved by the High Court in London in or about April 2003. At approximately the same time, the company's court-appointed representatives filed an ancillary proceeding in the United States Bankruptcy Court for the Southern District of New York pursuant to the former **11 U.S.C. § 304**, seeking an order recognizing and assisting Marconi's reorganization in the United States. n1 On May 14, 2003, the Bankruptcy Court entered an order that, among other things, gave "full force and effect in the United States" to the Scheme, deemed Marconi discharged in accordance with the terms of the Scheme, and enjoined Marconi's creditors from, among other things, "commencing or continuing any action or other proceeding related to any [Marconi] Scheme Claim" against Marconi. (Order of May 14, 2003, at 5-6.)

- - -Footnotes- - -

n1 **§ 304** was repealed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 802(d)(3) (2005), and replaced by a new chapter 15 of the Bankruptcy Code. See, e.g., 2 Collier on Bankruptcy, at 304-1 ed. note (15th ed. rev. 2006) (noting that chapter 15 is only effective "in cases commenced on or after October 17, 2005"). However, because the ancillary proceedings involved here were filed under **§ 304**, and because both parties refer to **§ 304** and not to any replacement statute as governing this case, the Court will refer to that section in the present tense.

- - -End Footnotes- - -
{*3}

Osanitsch, apparently unaware of the Bankruptcy Court's order, brought an action against Marconi and others in the California state courts in December 2004. Marconi removed the case to federal court, and on February 10, 2006, the United States District Court for the Northern District of California (the Honorable Charles R. Breyer, United States District Judge) denied Osanitsch's motion to remand and dismissed the case, finding it barred by the Bankruptcy Court's injunction, "without prejudice to plaintiff re-filing the action in bankruptcy court." (Order of Dismissal, Osanitsch v. Marconi PLC, No. C 05-3988 CRB, at 1 (N.D. Cal. Feb. 10, 2006)).

Osanitsch then filed this action as an adversary proceeding in the Bankruptcy Court, essentially repeating the same claims that had been dismissed in California. Marconi filed a motion to dismiss Osanitsch's complaint, which the Bankruptcy Court converted *sua sponte* to a motion for summary judgment pursuant to **Federal Rule of Civil Procedure 56** and **Federal Rule of Bankruptcy Procedure 7056**. (Order Granting Motion of Defendant Marconi PLC for Summary Judgment {*4} and Dismissing Adversary Proceeding, Osanitsch v. Marconi PLC, No. 06-01262 (SMB), at 1-2 (Bankr. S.D.N.Y. Aug. 7, 2006)). Thereafter, the Bankruptcy Court, upon the above undisputed facts, granted summary judgment to defendants dismissing the case for lack of jurisdiction. Id. at 5. Osanitsch appealed that order to this Court.

## DISCUSSION

Because the issues in this case are matters of statutory interpretation, the Court reviews the decision of the Bankruptcy Court de novo. **In re Koreag, Controle et Revision, S.A., 961 F.2d 341, 347-48 (2d Cir. 1992).** n2

- - -Footnotes- - -

n2 The decision to grant a § 304 petition by a bankruptcy court is reviewed under an abuse of discretion standard. See **In re Treco, 239 B.R. 36, 40 (S.D.N.Y. 1999).** However, as discussed *infra*, there is no contention that the Bankruptcy Court abused its powers in granting the § 304 petition. The only issue before this Court is the Bankruptcy Court's interpretation of its subject matter jurisdiction under § 304, an issue to be reviewed de novo.

- - -End Footnotes- - -
{*5}

**Former § 304 of the Bankruptcy Code** authorizes representatives of a foreign bankrupt to institute ancillary proceedings in the United States Bankruptcy Courts "to protect the administration of the foreign proceeding." Id. at 348. "Among the forms of relief authorized by § 304 are an injunction prohibiting actions against the debtor and the 'turnover' of property to a foreign representative." **In re Treco, 240 F.3d 148, 151 (2d Cir. 2001),** citing 11 U.S.C. § 304(b)(1), (2). "The purpose of a § 304 petition is to prevent the piecemeal distribution of assets in the United States by means of legal proceedings instituted in domestic courts by local creditors," and the bankruptcy courts are given broad discretion to fashion appropriate remedies. **Koreag, 961 F.2d at 348.**

These powers are not limitless. In Treco, the Second Circuit emphasized that § 304 sets forth a number of factors that must be balanced by a bankruptcy court in deciding whether to grant relief under § 304. The statute represents "a step toward the universality approach" in which "a primary insolvency proceeding is instituted in the debtor's domiciliary {*6} country, and ancillary courts in other jurisdictions -- typically in jurisdictions where the debtor has assets -- defer to the foreign proceeding and in effect collaborate to facilitate the centralized liquidation of the debtor's estate according to the rules of the debtor's home country." **240 F.3d at 153-154.** However, the statute represents only a "modified" universalism that accepts the notion that assets should be collected and distributed on a worldwide basis, but reserves to local courts the discretion to evaluate the fairness of the foreign bankruptcy proceedings and to protect the interests of local creditors. **Id. at 154.** The statute thus expressly directs the bankruptcy court to evaluate a number of factors before deferring to the foreign court and granting the requested relief. Id. In Treco, the Court of Appeals reversed an order of the Bankruptcy Court, finding that that court had abused its discretion in granting an order requiring turnover of certain property to the bankruptcy estate. **Id. at 160-61.**

In this case, however, there is no contention that the Bankruptcy Court abused its powers in granting the relief requested {*7} by the Marconi representatives. The Court expressly found that relief was necessary "to permit the expeditious and economical administration" of the foreign bankruptcy; that absent relief, creditors would likely sue Marconi in the United States and thereby do "irreparable injury" to the ability of the British representatives to marshal Marconi's assets and administer them in accordance with the reorganization Scheme; and that the relief requested -- including an injunction against such suits -- "will not cause undue hardship or inconvenience to" American creditors of Marconi, or at least that any such hardship or

inconvenience "is outweighed by the benefits to [Marconi], its estate and [its] creditors." (Order of May 14, 2004, at 4-5.) The Bankruptcy Court thus properly enjoined the bringing of a lawsuit such as that pursued by Osanitsch.

The present complaint sought to institute an adversary proceeding in the Bankruptcy Court. The amended complaint incorporated by reference the complaint previously filed in California (Am. Compl. P 3), and expressly demanded "judgment for the damages and other relief prayed for in [the California complaint]." (Id. at 5.) The complaint further {*8} alleged that the proceeding "is one arising in the debtor's case number 03-B-11949 pursuant to **Section 304 of the Bankruptcy Code**," and that the court "has jurisdiction pursuant to **28 U.S.C. § 1334** [and] **11 United States Code section 304**." (Id. P 2; emphasis omitted.) But as defendants point out, to the extent that plaintiff seeks a judgment for damages, these provisions do not authorize institution of an action in the Bankruptcy Court.

**Section 304** is a strictly limited provision. It authorizes the institution of a particular kind of action by particular parties. Only a "foreign representative," as defined by the Code, n3 may file a petition under **§ 304(a)**; Osanitsch does not and cannot claim that he meets this definition. Although **§ 304(b)** grants the court broad discretion to fashion appropriate relief, the types of relief specifically authorized by **§ 304(b)** and the considerations that the court is directed to apply under **§ 304(c)** make clear that the action contemplated by **§ 304** is one by authorized representatives of the foreign bankrupt to marshal and protect the estate's assets in the United States {*9} for distribution in the bankruptcy proceeding abroad. n4 Osanitsch does not seek to pursue such an action; rather, he seeks to obtain a judgment against the bankrupt and other parties.

- - -Footnotes- - -

n3 "Foreign representative" is defined under **§ 101 of the Bankruptcy Code** as "[a] duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." **11 U.S.C. § 101(24).**

n4 See, e.g., **In re Evans, 177 B.R. 193 (Bankr. S.D.N.Y. 1995).**

- - -End Footnotes- - -

As this Court has previously held, the filing of a § 304 petition "does not create a bankruptcy 'estate' that must be 'administered' by the court." **Sturge v. Smouha (In re Smouha), 136 B.R. 921, 929 (S.D.N.Y.**

**1992), appeal dismissed, 979 F.2d 845 (2d Cir. 1992).** An ancillary proceeding under § 304 "is not a bankruptcy that implicates the full range of procedural and substantive provisions applicable to domestic bankruptcies." **Koreag, 961 F.2d at 357.** {*10} In such a proceeding, a bankruptcy court lacks the full range of jurisdiction that applies when the Court is seized of a domestic bankruptcy matter. As the Bankruptcy Court ruled in Treco, "to the extent that [an] action preserves, protects or recovers property of the foreign debtor, we have jurisdiction under § 304 to adjudicate it. By contrast, *claims that are unrelated to the preservation or recovery of property in aid of a foreign proceeding are outside the ambit of our limited § 304 jurisdictional mandate.*" **Petition of Treco, 227 B.R. 343, 349-50 (Bankr. S.D.N.Y. 1998)** (emphasis added). n5

- - -Footnotes- - -

n5 The Second Circuit's decision in Treco has no bearing on this analysis. The Court of Appeals did not address the jurisdictional ruling. It simply held that the Bankruptcy Court erred on the merits in granting the relief requested by the foreign representative, a turnover of property, in that portion of the action over which the Bankruptcy Court correctly held that it *did* have jurisdiction. **Treco, 240 F.3d at 160-61.** Cf. *id.* at 161 ("We pause to underscore ... that the case-specific analysis required by § 304 will in many or most cases support the granting of the requested relief.").

- - -End Footnotes- - -
{*11}

**Section 304** thus does not permit the filing by domestic creditors of adversary proceedings to establish claims against a foreign bankrupt. Indeed, its very purpose is to centralize such proceedings (where the bankruptcy court determines that such centralization is appropriate) in the foreign court administering the bankruptcy. To permit the filing of such actions under the rubric of the bankruptcy court's § 304 "matter" would defeat the entire purpose of that provision.

This conclusion would matter little if the Bankruptcy Court had jurisdiction of the action pursuant to some other statute, and the complaint also invokes jurisdiction under 28 U.S.C. § 1334. That statute confers upon the district courts (and the bankruptcy courts that are a department of the district courts)

jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." Id. § 1334(b). This jurisdiction, when properly invoked, is very broad. But it does not help Osanitsch.

"'Arising in' and 'arising under' proceedings encompass the matters that are at the core of the jurisdiction of the bankruptcy courts, and depend upon the application {*12} or construction of bankruptcy law as expressed in Title 11." In re Leco Enterprises, Inc., 144 B.R. 244, 248 (S.D.N.Y. 1992) (citation and internal quotation marks omitted). The category is essentially identical to the classification of "core" bankruptcy proceedings for purposes of 28 U.S.C. § 157(b)(2). Id. "To be a core proceeding, an action must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment." Acolyte Elec. Corp. v. City of New York, 69 B.R. 155, 173 (Bankr. E.D.N.Y. 1986), aff'd, 1987 WL 47763 (E.D.N.Y. Mar. 27, 1987). Osanitsch's complaint manifestly does not fall within this category. It raises no claims created by or unique to bankruptcy law, but rather ordinary tort and contract claims arising under the common law of California. n6

- - -Footnotes- - -

n6 Indeed, the complaint itself acknowledges that the action it seeks to bring "is a non-core proceeding." (Am. Compl. P 13.)

- - -End Footnotes- - -
{*13}

The broadest category of bankruptcy jurisdiction involves matters "related to cases under title 11." 28 U.S.C. § 1334(b). n7 As this Court has held in giving an expansive reading to that provision, "[t]he dominant standard for 'related to' jurisdiction is that set forth by the Third Circuit in In re Pacor, Inc., 743 F.2d 984 (3d Cir.1984). The Pacor test states that a civil proceeding is 'related to bankruptcy' if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.' Id. at 994." In re WorldCom, Inc. Securities Litigation, 293 B.R. 308, 317 (S.D.N.Y. 2003) (emphasis removed). But in a § 304 proceeding, as discussed above, there is no "estate being administered in bankruptcy" in the United States. Accordingly, even under this quite expansive test, there is no basis for contending that Osanitsch's common-law tort and contract claims are related to any bankruptcy case. n8

- - -Footnotes- - -

n7 See, e.g., In re WorldCom, Inc. Securities Litigation, 293 B.R. 308, 317 (S.D.N.Y. 2003) ("[W]hile 'related to' jurisdiction is not limitless, it does encompass more than simply proceedings involving the property of the debtor or the estate.") (citation and internal quotation marks omitted).

{*14}

n8 Cf. In re Wachsmuth, 272 B.R. 766, 770 (Bankr. M.D. Fla. 2001) ("It is evident that Congress did not intend to vest jurisdiction in the Bankruptcy Court by § 304 ... to maintain a pure state law non-core proceeding which is not even related to a pending case under 28 U.S.C. § 1334(b).").

- - -End Footnotes- - -

Osanitsch's somewhat desperate claims of non-bankruptcy-related jurisdiction are without merit. He argues that Marconi somehow conceded jurisdiction by removing his California action to federal court on grounds of diversity of citizenship. (Pl. Mem. 12; Pl. Reply Mem. 2-5.) But it is axiomatic that federal jurisdiction cannot be created by consent or waiver or estoppel. United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 303 (2d Cir. 1994). In any event, the issue here is not the jurisdiction of the District Court in California, but of the Bankruptcy Court here. Osanitsch's complaint nowhere invokes diversity jurisdiction or alleges the plaintiff's citizenship, n9 and it was filed {*15} directly in the Bankruptcy Court. Nor does it help to note, as Osanitsch correctly does, that the Bankruptcy Court is simply an arm of the District Court. That is so; but if Osanitsch sought to bring a non-bankruptcy action in the District Court, the proper way to do that was to file in the District Court itself. n10

- - -Footnotes- - -

n9 The complaint nowhere invokes diversity jurisdiction, and does not properly allege diversity of citizenship. Although the underlying California complaint, incorporated by reference in the Bankruptcy Court amended complaint (Am. Compl. P 3), alleges that Osanitsch was a resident of Petaluma, California at the time of the events giving rise to the claims (Id. Ex. 3, P 1), it does not assert that he is a

United States or California citizen and does not refer to his residence as of the time the complaint was filed.

n10 Osanitsch argues that the Bankruptcy Court should have requested that this Court withdraw the standing reference of bankruptcy matters to it, rather than dismissing for lack of jurisdiction. (Pl. Mem. 12.) But Osanitsch does not refer to any evidence in the record that he ever asked the Bankruptcy Court to make such a request. In any event, this Court's rules make clear that the proper way to seek withdrawal of the reference is to make a motion in the District Court, not in the Bankruptcy Court. Cf. **In re Agency for Deposit Ins., Rehabilitation, Bankruptcy and Liquidation, 2002 U.S. Dist. LEXIS 24838, 2002 WL 31898125, at *1 (S.D.N.Y. Dec. 30, 2002)**. And as noted above, the contemplated procedure is somewhat bizarre: the proper way to bring a diversity action is to file in the District Court in the first place, not to file a complaint in the Bankruptcy Court and then seek withdrawal of the reference. Finally, in the interest of orderly procedure, this Court declines to withdraw the reference *sua sponte* and convert Osanitsch's bankruptcy appeal into a free-standing diversity complaint. Among the many reasons to reject any such maneuver, the Court notes that precisely such an action remains pending in California, where Osanitsch has appealed Judge Breyer's dismissal to the Ninth Circuit. (Defs. Mem. 6.)

- - -End Footnotes- - -
{*16}

The Bankruptcy Court was thus correct to hold that it lacked jurisdiction over plaintiff's complaint, at least to the extent that the complaint seeks a judgment for damages. n11

- - -Footnotes- - -

n11 Indeed, if Osanitsch was permitted to pursue his claims in the Bankruptcy Court, he would receive the benefit of an additional forum in which to litigate his claims simply because he happened to sue a bankrupt party. As the Third Circuit has noted, "[b]ankruptcy jurisdiction . . . was

not conferred for the convenience of those not in bankruptcy to enlarge the possibility of recovery over and above that which they otherwise may have had." **Pacor, 743 F.2d at 994.**

- - -End Footnotes- - -

But the complaint is not limited to seeking such relief. In addition to setting forth the factual basis for his claims for damages in tort and contract, and seeking a judgment thereon, Osanitsch also appears to seek other relief that is within the jurisdiction of the Bankruptcy Court to grant. The complaint sets forth the undisputed facts that the Bankruptcy {*17} Court entered an order pursuant to § 304, that the defendants "have asserted the protection of [that] order" against the action brought by plaintiff in California, and that the Bankruptcy Court "reserved and retained jurisdiction with respect to the enforcement, amendment or modification of its . . . order." (Am. Compl. PP 10-11.) Plaintiff concludes from this that the Bankruptcy Court "therefore retains jurisdiction over the defendants' asserted protection" (id. P 11), and prays the court that his claims against Marconi "be permitted to proceed to resolution by final judgment in an appropriate forum" (id. at 5). In short, Osanitsch asked the Bankruptcy Court to modify its injunction to permit his California action to go forward.

There can be no doubt that the Bankruptcy Court has jurisdiction to provide such relief. First, as noted above, § 304 provides the Bankruptcy Court broad discretion to tailor the relief accorded to foreign representatives. Cases such as Koreag and Treco make clear that in determining the scope of the relief to be granted (if any), the court must consider *all* of the factors set forth in § 304(c), n12 including protection of the legitimate {*18} interests of claim holders in the United States. n13 Upon balancing those factors in 2003, the Bankruptcy Court entered a broad injunction. But Osanitsch was not a party to those proceedings, and the Bankruptcy Court accordingly had no ability to consider his claims, his interests, and his arguments in determining the appropriate scope of the injunction. The Court had the power to enter a more limited injunction at the time, had Osanitsch then appeared, and it certainly has the inherent power to modify that injunction now, if it appears appropriate to do so in light of Osanitsch's contentions.

- - -Footnotes- - -

n12 See also **In re YMB Magnex Int'l, Inc., 249 B.R. 402, 411 (Bankr. E.D. Pa. 2000)** ("[A]ll factors discussed in 11 U.S.C.

§ 304 should be evaluated and given even weight.") (citing 2 **Collier on Bankruptcy P 304.08** (15th ed. rev. 2006)). See, e.g., **Haarhuis v. Kunnan Enters., LTD., 223 B.R. 252, 255 (Bankr. D.D.C. 1998)** ("These factors are not requirements but are, rather, guideline criteria by which the bankruptcy court should measure the extent to which foreign law is compatible with U.S. practice.").

{*19}

n13 See, e.g., **In re Hourani, 180 B.R. 58, 66 (Bankr. S.D.N.Y. 1995)** (denying debtor's § 304 petition on the ground that the Jordanian bankruptcy laws did not "ensure integrity and fairness" for the creditors).

- - -End Footnotes- - -

Second, the Bankruptcy Court expressly reserved that very power, just as Osanitsch alleges. The Court's order specifically provides that "this Court retains jurisdiction with respect to the enforcement, *amendment or modification* of [this] Order." (Order of May 14, 2003, at 9; emphasis added.) There is thus no plausible argument that the Bankruptcy Court lacks jurisdiction to grant a portion of the relief requested by Osanitsch -- an amendment or modification of the injunction to permit his claims to go forward in California. n14

- - -Footnotes- - -

n14 See, e.g., **In re Banco Nacional de Obras y Servicios Publicos, S.N.C., 91 B.R. 661, 668 (Bankr. S.D.N.Y. 1988)** (modifying § 304 injunction to permit union to continue prosecuting its action in District Court). See also **YMB Magnex, 249 B.R. at 411** (modifying § 304 injunction to permit claims against debtor for contribution and indemnity in a class action suit).

- - -End Footnotes- - -
{*20}

This Court, of course, intimates no view as to whether such an amendment or modification would be a prudent exercise of discretion. The Bankruptcy Court might be persuaded that the effective administration of the foreign bankruptcy proceedings warrants a continued injunction, and relegates Osanitsch to his remedies under the Scheme of Arrangement. Indeed,

Osanitsch has apparently submitted a claim under the Scheme, which was rejected by the Scheme Supervisors. (Pl. Mem. 4; Defs. Mem. 6-8.) n15 The Bankruptcy Court thus might conclude that the injunction against proceedings in American courts should continue in force, and that the remedy of appeal to an arbitrator in London adequately protects Osanitch's interests and most efficiently furthers the administration of the estate. Or it might be persuaded by Osanitsch's argument that he should be allowed to proceed with the California action, because the Scheme permits, as an alternative remedy, the maintenance of an "Ascertainment Proceeding" including a lawsuit in an appropriate court. (Pl. Mem. 4; Defs. Mem. 8.) But however the Bankruptcy Court disposes of Osanitsch's request, its ruling will be an exercise of discretion on the merits, {*21} and that Court clearly has jurisdiction to make such a ruling.

- - -Footnotes- - -

n15 The claim was rejected on the basis of a release signed by Osanitsch when he left his job. (Defs. Mem. 7.)

- - -End Footnotes- - -

## CONCLUSION

Accordingly, to the extent that the Bankruptcy Court ruled that it lacked jurisdiction to adjudicate plaintiff's common-law claims on the merits, its ruling was correct. However, because the Court does have jurisdiction to modify its § 304 injunction, and because plaintiff's complaint requested such relief, the Bankruptcy Court's judgment dismissing the entire complaint for lack of jurisdiction must be vacated, and the case remanded to the Bankruptcy Court for that Court to address plaintiff's application for amendment or modification of the injunction.

SO ORDERED.

Dated: New York, New York
January 30, 2007
GERARD E. LYNCH
United States District Judge

In re: NORTHWESTERN CORPORATION, Debtor. NORTHWESTERN CORPORATION and CLARK FORK AND BLACKFOOT, LLC, Plaintiffs, -vs- MARGARET A. MCGREEVEY, JO ANN BARKELL, and JOSEPH MARTELLI, on behalf of themselves and the class of similarly situated individuals, Defendants.

Chapter 11, Case Nos. 03-12872 (JLP), Adv. No. 05-52525 (JLP)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2005 Bankr. LEXIS 2146

October 25, 2005, Decided

**COUNSEL:** {*1} For Northwestern Corporation and Clark Fork and Blackfoot LLC, Plaintiff: Dennis A. Meloro, Greenberg Traurig, Wilmington, DE; William E. Chipman, Jr., Greenberg Traurig, LLP, Wilmington, DE.

For McGreevey Class Action Claimants, Defendant: Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE.

For Northwestern Corporation and Clark Fork and Blackfoot LLC, Counter-Defendant: Dennis A. Meloro, Greenberg Traurig, The Nemours Building, Wilmington, DE.

For Northwestern Corporation aka Northwestern Public Service aka The Montana Power, L.L.C. aka Northwestern Energy, L.L.C. aka Northwestern Energy-SD/NE aka Northwestern Energy-Montana, Debtor: Charles Michael Terribile, William E. Chipman, Jr., Greenburg Traurig LLP, The Brandywine Building, Wilmington, DE; Dennis A. Meloro, Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, The Nemours Building, Wilmington, DE; Evelyn J. Meltzer, Pepper Hamilton LLP, Hercules Plaza, Wilmington, DE; Monica Leigh Loftin, Paul D. Brown, Greenberg Traurig, LLP, The Nemours Building, Wilmington, DE; Robert Lee Striker, Leonard Street and Deinard, Minneapolis, MN; William Pierce Bowden, Ashby & Geddes, Wilmington, {*2} DE.

Mark S. Kenney, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: Charlene D. Davis, Eric Michael Sutty, GianClaudio Finizio, The Bayard Firm, Wilmington, DE; Donna L. Harris, Cross & Simon, LLC, Wilmington, DE; John C. Phillips, Jr, Phillips, Goldman & Spence, Wilmington, DE.

**JUDGES:** JOHN L. PETERSON, United States Bankruptcy Judge.

**OPINION BY:** John L. Peterson

**OPINION:** *MEMORANDUM OF DECISION and ORDER*

In Cause No. 05-52525, Plaintiff Northwestern Corporation ("NOR") filed an adversary complaint and objections to claims against the defendants Margaret A. McGreevey, *et al.*, who represent a class of former shareholders of the Montana Power Company ("MPC") which seek damages and other relief against a number of individuals and entities arising out of the divestiture of MFC. The McGreevey class filed an action on August 11, 2005, styled *McGreevey, et al v. MPC, NOR and the Clark Fork and Blackfoot LLC* ("CFB"), as defendants, Cause No. DV-05199, Montana Second Judicial District Court, Butte-Silver Bow County, Montana, seeking a judgment to impress a constructive or equitable trust on utility assets {*3} of the NOR purchase in 2002 from MPC, as more fully explained herein. NOR has removed the action to the United States District Court for the District of Montana, where it is now pending on McGreevey's motion for remand.

The present action seeks to enjoin the McGreevey state court action on the basis that it violates provisions of the confirmed chapter 11 plan of reorganization of NOR, has no basis in law or fact and seek an award of attorney's fees and costs. The matter is before this Court on NOR's Motion for Order to Show Cause why a Permanent or Preliminary Injunction should not be issued enjoining the continued prosecution of the cause DV-05199. Hearing on the Motion was held October 19, 2005, with counsel for each party present. Each party has filed pre-hearing memoranda in support of their respective positions and oral argument was made by counsel at the hearing. At the conclusion of the hearing the Court took the matter under advisement and is now prepared to rule.

The gravamen of the dispute is based on NOR's purchase of the utility assets, namely the transmission and distribution system of the MPC, under a Unit Purchase Agreement ("UPA") dated September 29, 2000, between {*4} NOR, as Buyer and Touch America Holdings, Inc., MPC and MPC LLC as sellers. One of the provisions of the UPA (sec. 2.23) required the sellers to obtain the affirmative vote of the holders of record of at least 2/3rds of the outstanding common stock of MPC approving the sale. While the McGreevey state court complaint alleges MPC wrongfully sold "all or some of its assets without obtaining shareholders approval in violation of § 35-1-823, MCA", that allegation is not true as to the purchase of the utility assets of MPC by NOR because on October 2, 2000, MPC and NOR announced the sale, and MPC represented in its 8-K filing with the SEC that purchase needed approval of MPC's shareholders, which MPC sought and received n1.

- - -Footnotes- - -

n1 Allegations from *Plan Trust of Touch America Holdings, Inc. v. Goldman, Sachs et al.* (DV-04-250), attached as an agenda item.

- - -End Footnotes- - -

In the McGreevey class Fourth Amended Complaint, Cause No. DV-01-141, Montana Second Judicial District, Butte Silver Bow County, now pending in U.S. District Court, {*5} attached as a hearing agenda item, the plaintiff alleges as true allegations in paragraph 6, p. 7, and paragraph 9(c), p. 9, as follows:

7. The final step of the original integrated plan to exit the energy business involved selling defendant Montana Power company's gas and electric distribution system to Northwestern Corp. for more than $ 1 billion, and then converting the old company into Touch America, Defendant Montana Power Company's telecommunication subsidiary. Defendant Montana Power Company has merged Defendant Montana Power Company into a Montana Power L.L.C., a subsidiary of Touch America Holding with Montana Power LLC being the surviving entity. The Montana Power L.L.C. entity has been sold to Northwestern Corp., leaving Touch America Holdings with only two companies, those being Touch America, Inc. And Tetragenics Co., which develops computer based monitoring systems.

Under the scheme, shareholders of Defendant Montana Power Company have or will become shareholders of Touch America Holdings.*** 9. (C) As a final phase, Defendant Montana Power agreed to sell its transmission facilities to Northwestern Corp. and guaranteed that Montana Power Company would {*6} either obtain shareholder approval or pay $ 10 million liquidated damage sum to Northwestern Corp. (Emphasis added).

It is noteworthy this Complaint notes lack of shareholder's approval on divestiture of the generation, coal and oil and gas businesses, and independent power production licenses as a prime claim for relief, but does not assert such lack of shareholder approval on the Northwestern sale of the energy component. Moreover, nothing is alleged that the Northwestern purchase was somehow clouded with fraud. In the Memorandum of Understanding ("MOU") in Cause DV-01-141, contained in NOR's Motion for Order under **Rule 9019**, NOR noted it was joined in cause DV-01-141 to cover any judgment against NWE, because the McGreevey class had filed Proof of Claim No. 744 against NOR asserting the assets of NWE LLC were transferred to NOR in violation of fraudulent transfer law. The MOU covered the D & O policies of Montana Power Company, which were to contribute $ 67,000,000.00 to the settlement fund with attendant full release of the claims. It was not approved, but the reason is not in this record. Thereafter, upon stipulation of the parties, the Bankruptcy Court approved a stipulation {*7} that the McGreevey claimants "shall have until 4:00 p.m. (EDT") on August 13, 2004, to file their objections to the Debtor's proposed plan." The stipulation was signed by the parties on August 2, 2004. The class failed to file any objection. The amended plan was confirmed with this provision (p. 62):

3. Binding Effect. In accordance with **section 1141(a) of the Bankruptcy Code**, the Plan and its provisions shall be, and hereby are, binding upon the Debtor, any Person acquiring or receiving a distribution under the Plan, any entity issuing securities under the Plan, any lessor of property to the Debtor, any lessee from the Debtor, any creditor of the Debtor and any holder of a claim against or Equity interest in the Debtor, and their respective successors and permitted assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted or rejected the Plan, or will or will not receive a distribution under the Plan" (Emphasis added).

Thus the MPC shareholders, now represented by the McGreevey class, approved the sale by over 2/3rd of the outstanding shares voting affirmatively {*8} in favor of the UPA, thus satisfying the provisions of § 35-1-823 n2. Nevertheless, the McGreevey class now seeks an order avoiding the transfer and directing the return of the utility assets as being fraudulent, with an intentional hindrance of creditors, unjust enrichment, rendering CFB insolvent, so as to impose under the provisions of the Montana Uniform Fraudulent Transfer Act, §§ 31-2-328(3) and (4), 333 (1)(a) and (b), and 334(1), an actual and constructive trust in the Montana utility assets held by NOR for the benefit of the MPC shareholders.

- - -Footnotes- - -

n2 No basis is alleged in the state court complaint which resulted in an order in that court establishing the McGreevey class in Cause DV-05199 pursuant to Mont. R. Civ. P. (Mont.) Rule 23 or 23.1. Certainly it could not certify as a violation of § 35-1-823.

- - -End Footnotes- - -

The UPA provided that NOR would pay for the utility assets the sum of $ 602 million dollars cash and assume MPC liabilities of just under $ 500 million, for a total consideration of $ 1.1 billion dollars. {*9} NOR made the payment pursuant to the UPA and assumed the debt in 2002 and on November 15, 2002, transferred the assets from CFB and NWE LLC to NOR.

The structure used to facilitate the transfer of the utility assets by MPC involved the creation of MPC LLC by MPC, and CFB together with Northwestern Energy LLC (NWli) by NOR, so that MPC LLC merged with CFB to take the assets to pass on to NOR through NWE. This has been called a "going flat" transaction or upstreaming the assets to NOR. McGreevey argues that when the CFB/N WE merger took place, CFB received no consideration for the transfer, except for the assumption of some debts, which thus left CFB insolvent. McGreevey contends that such structure invoked the provision of § 35-8-1203 MCA which provides "all debts, liabilities and other obligations of each [merging party] that are party to the merger become the obligations of the surviving entity", namely CFB, a limited liability company in which the shareholders of MPC never had an ownership interest. After MPC utility assets were merged in MPC LLC, that entity was joined in the UPA. State court legal action by McGreevey has

ensued against a number of entities, but as to NOR, it {*10} joined that action as party defendant so that it would be responsible for any judgment which McGreevey might recover against NWE to the extent NWE is liable to satisfy the judgment. NOR's joinder by stipulation retained all legal defenses of NOR. Thus, the McGreevey class contends it has creditor status against NOR.

NOR filed for chapter 11 bankruptcy relief in September, 2004. In the case, McGreevey filed two proofs of claim, to which objection has been filed by NOR. Moreover, McGreevey moved the bankruptcy court for relief from the automatic stay under 11 U.S.C. § 362 so it could file an adversary proceeding against NOR to establish the constructive trust. McGreevey's motion attached a specimen Adversary Complaint under the heading "In the United States Bankruptcy Court for the District of Delaware". After objection to the motion was filed by NOR claiming the claims allowance and disallowance procedure would govern and resolve the matter, the bankruptcy court, based upon the stipulation made by NOR when added as a defendant in the class action suit filed in 2001, would survive and thus the proper method to resolve the issues of alleged fraudulent transfer {*11} would be to allow McGreevey to file the adversary complaint attached to their motion. However, that complaint was never filed. Moreover, the McGreevey class never filed any objections to the Second Amended Plan of Reorganization asserting the constructive trust to the utility assets, and thereby preserving their legal position.

Ironically, another creditor, Magten Asset Management Corp. ("Magten") a holder of "QUIP" debentures assumed by NOR pre-petition, asserted the very same constructive trust/fraudulent conveyance position as McGreevey. In the order confirming the plan, the presiding Bankruptcy Judge Case stated:

"The court hereby finds that the going flat' transaction is all of one transaction and but for the going flat' transaction the Debtor would have no liability on the QUIPS notes."

In addition, Judge Case found that Magten, like McGreevey in the state court action, asserted "in rem" property interests in the Montana assets and that such assets were being held in a constructive trust for the benefit of the QUIPS holders. Judge Case found that Magten

"took no action to impose a constructive trust in the Montana assets and presented no evidence whatsoever {*12} as to why they should be entitled to a constructive trust with respect to the Montana assets . . .

Moreover Magten . . . failed to cite a statute or case in support of their in rem property interest. The court finds persuasive Section 7 of the Uniform Fraudulent Transfer Act, as adopted in Montana, which contemplates that money damages are an adequate remedy for fraudulent transfer claims. Accordingly, the court finds no constructive trust has been established and money damages are an appropriate remedy for the holders of the QUIPS Litigation Claims."

The Court concluded the QUIPS notes were nothing more than general unsecured claims under section 7.5 of the plan, and indeed the confirmed plan specifically provides for such treatment in Class 8 of the plan.

It is noteworthy here, that unlike Magten, McGreevey made no effort whatsoever to establish a constructive trust from the "going flat" transaction, in the bankruptcy court, pre-confirmation. McGreevey now claims under fraudulent conveyance/constructive trust theory that claim survived the plan process and passed through unaffected due to a provision in the confirmed plan, sec. 5:13b, which provides:

"Except as otherwise {*13} expressly provided in this plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and one Additional Indemnities, shall not be released from any and all claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy code or similar claims or cause of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego claims, as a consequence of transactions, events or circumstances involving or affecting the Debtor (or any of its predecessors or any of their respective businesses or operations that occurred or existed prior to the Effective Date."

The McGreevey argument may carry some weight if they had a viable fraudulent conveyance action under the Montana Fraudulent Conveyance Act. They do not.

The corporate mechanisms established by the seller MPC and the buyer NOR, mat is, the creation of MPC LLC, CFB and NWR LLC, were established to separate the MPC utility assets from the telecommunication assets of Touch America ("TA") so as to allow MPC to divest and sell the utility {*14} assets separate and apart from the telecommunication assets, which were retained by TA and MPC. McGreevey's argument that CFB was left insolvent is a fiction which exalts form over substance. The substance of the transaction, under the UPA, concurred in by the MPC shareholders, plainly provided for the sale and purchase of the utility assets between MPC

and NOR for $ 1.1 billion dollars. That sum was paid and received by MPC for its benefit and the benefit of its concurring shareholders. That feet is a given! Thus, when the transaction was completed by November 15, 2002, and the assets passed on to NOR through the various limited liability companies, the debtor/creditor relationship between NOR and MPC and its shareholders was satisfied, and therefore terminated. As a result, when NOR sought bankruptcy relief under chapter 11, MPC and its shareholders were no longer a creditor of NOR. This situation is fatal to the McGreevey class's state court action under the Montana Fraudulent Transfer Act as a matter of law. It is clear that in order for a party to seek the remedies under § 31-2-339, by the express definition of § 31-2-328(3) and (4) the creditor/plaintiff must have a claim, {*15} i.e., right to recover, as a predicate to maintain the action. It is further clear from the undisputed facts here that the McGreevey class does not have such claim, and is thus not a creditor because the UPA was satisfied by NOR's payment. As Judge Case held, and as 1 adopt, the "going flat" transaction is "all one transaction". The mechanism of creation of LLC's to effect the transfer and payment was indeed all one transaction, and it defies logic to argue otherwise. The McGreevey class simply cannot parse one aspect of the transfer and call it fraudulent. That would stand the confirmed plan of reorganization on its head, for the entire basis of the chapter 11 plan rested upon the utilization, implementation and consummation of the acquired Montana utility assets. The Montana court litigation now pending in the U.S. District Court has thus no basis for relief in law or fact. The claims filed by the McGreevey class in the bankruptcy case have no merit.

It is a well established principle of bankruptcy jurisprudence that an alleged creditor which files a claim in a bankruptcy case triggers the process of "allowance and disallowance of claims", thereby subjecting that person to the bankruptcy {*16} court's equitable powers. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *Gardner v. New Jersey*, 329 U.S. 565, 573, 67 S. Ct. 467, 91 L. Ed. 504 (1947). *In re Carnell Construction Corp.*, 424 F.2d 296, 298 (3rd Cir. 1970) (quoting *In re Beasley-Gilbert's, Inc.*, 285 F.Supp. 359, 361 (S.D. Ohio 1968)) plainly holds:

"It is settled that a creditor who proves a claim submits himself to the summary jurisdiction of the Bankruptcy court in respect of preferences or voidable transfers, including the jurisdiction of the Bankruptcy Court to enter a monetary judgment or order a return,"

Moreover, it is axiomatic that a bankruptcy court possesses the inherent authority to enforce its own