orders, such as an order confirming a chapter 11 plan of reorganization. *In re Continental Airlines, Inc.*, **236 B.R. 318, 325-26 (Bankr. Del. 1999)**; *see, also,* **F.R.B.P. Rule 3020(d)**. Finally, to preserve the plan post-confirmation by the bankruptcy court, *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, **372 F.3d 154 (3rd Cir. 2004)** and *In re Pegasus Gold Corporation*, **394 F.3d 1189 (9th Cir. 2004)** {*17} hold "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold jurisdiction over the matter." Not only is there a close nexus in the cause *sub judice*, there is complete nexus for this Court to entertain jurisdiction to preserve the implementation and consummation of the plan for the plan creditors where, as here, the McGreevey class seeks erroneously, and without legal basis, to upset the entire underpinnings of the confirmed plan or reorganization by asserting a constructive trust over the Montana utility assets which form the bases of the success of the plan and are assets of the bankruptcy estate. This is so, because a person subject to constructive trust which arises under Montana state law, being involuntary in nature, has a duty to convey it to another on grounds that the person holding bare legal title would be unjustly enriched if he were permitted to retain it. *In re Estate of McDermott*, **2002 MT 164, 51 P.3d 486, 310 Mont. 435 (2002)**. That would be an unjust result in this case where full consideration under the UPA was paid by NOR.

It is also well established that where a creditor or person files {*18} a proof of claim, and has the opportunity to contest the disclosure statement or proposed plan of reorganization particularly to assert a constructive trust or fraudulent conveyance action and does not do so in the bankruptcy case, when it could or should have done so, is barred from asserting that claim in another forum. The confirmed plan and order control under **11 U.S.C. § 1141**, defining the effect of confirmation, and acts like a contract that binds the parties who participate in the bankruptcy case or should have participated in the case. *Knupfer v. Wolfberg (In re Wolfberg)*, **255 B.R. 879 (Bankr. 9th Cir. 2000)**; *Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.)*, **262 B.R. 604 (Bankr; S.D. N.Y. 2001)**. It is undisputed that the McGreevey class participated in the debtor's chapter 11 case by filing proofs of claim and a motion for relief from stay to file an adversary proceeding in the bankruptcy case, which they did not pursue. Consequently, now asserting after confirmation of the plan in a state court forum, that the Montana utility assets were not property of the bankruptcy estate n3, the McGreevey class is precluded from litigating that issue in the state court action because {*19} they

failed to take any steps to raise the issue before the court and litigate to conclusion their contentions prior to confirmation. *Miller v. U.S.*, **363 F.3d 999 (9th Cir. 2004)**: *In re PWS Holding Corp.*, **303 F.3d 308, 315 (3rd Cir. 2002)**; *Celotex Corp. v. Edwards*, **514 U.S. 300, 313 (1995)** ("Respondents chose not to pursue this cause of action [appeal of the bankruptcy court's decision], but instead to collaterally attack the Bankruptcy Court's **section 105** injunction in the federal court of Texas. This they cannot be permitted to do without undercutting the orderly process of law."); *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, **324 B.R. 510, 521 (Bankr. Del. 2005)** ("The application of res judicata, or claim preclusion, bars a party from litigating a claim that it would have raised or did raise in a prior proceeding in which it raised another claim on the same cause of action"). The excuse for not pursing the adversary proceeding, filing objection to plan so as to raise the constructive trust issue, as Magten did, was that a proposed settlement was on the table dealing with the availability of MPC D & O insurance policy proceeds {*20} to be funneled to the McGreevey class, which proposal was later rejected by the Montana U.S. District Court since title to the proceeds is in issue. Such is a weak and unacceptable excuse at best since the McGreevey class could still have pursued its adversary proceeding if it truly believed it had merit, or at a minimum requested a delay in the confirmation process until the settlement issue was resolved. It did neither.

- - -Footnotes- - -

n3 **Section 1141(b)** provides: "Except as otherwise provided in the plan or order confirming the plan, the confirmation of a plan vests all property of the estate in the debtor."

- - -End Footnotes- - -

It is the position of NOR that plan provisions also bar the pending state court action because the McGreevey class claims were channeled into a D & O Trust, and the claims are thus discharged as to NOR with an attendant injunction against the McGreevey class allowing it to pursue their remedy in another forum. Arguing that the McGreevey class disagreement with that position is misplaced, NOR states if the McGreevey class {*21} did not like such plan treatment it should have filed an appropriate objection to confirmation of the plan, which it did not do. NOR's argument, based on the plan language of the plan provisions (provisions L0.5(a) and (e), 13.1, 5.13(b), 1.47 and 4.12) has merit, particularly where the

McUreevey class was served with the second amended plan, and did not seek any clarification from the court during the confirmation hearing by way of objection, as to the plan's intent, and how it would affect its constructive trust claim, particularly in light of NOR's position that the MPC D & O policies were not property of NOR's estate. In sum, the McGreevey class slept on its rights. However, due to my finding and conclusion that the McGreevey class was not and is not a creditor of NOR pre-petition I need not pass on NOR's position. This is particularly true since the Bankruptcy Court specifically found that the "Montana assets are property of the estate" in confirming the plan.

*Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004), involving a fraudulent conveyance action by a bankruptcy trustee to freeze potential estate assets, the court adopted the traditional test for {*22} preliminary injunction as follows:

To determine whether a preliminary injunction should issue, a court

balances the plaintiff's likelihood of success against the relative hardship to the parties. To receive a preliminary injunction, [a plaintiff is] required to show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests.

*Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) (internal citations and quotations omitted).

To establish a substantial likelihood of success on the merits, NOR must show that it will have a fair chance of success on the merits. *Id.* By reason of my conclusion that the McGreevey class was not and could not be a pre-petition creditor of NOR, it has no chance to establish a constructive trust under Montana's Fraudulent Transfer Act. NOR and its creditors and shareholders in the reorganized company will suffer immediate and irreparable harm if the McGreevey class {*23} is permitted to continue to prosecute the stale court action in any forum. Under settled law, where a party unilaterally violates a bankruptcy court order, that violation, standing alone, constitutes the only harm necessary for an injunction. *American Gen. Fin. v. Tippins (In re Tippins)*, 221 B.R. 11, 27-28 (Bankr. N.D. Ala. 1998); *In re Steffan*, 97 B.R. 741, 746 (Bankr. N.D. N.Y. 1989); *In re*

*McNeil*, 128 B.R. 603, 615 (Bankr. E.D. Pa. 1991). In sum, the McGreevey class cannot be permitted to "end run" the confirmation process and order confirming the plan by erroneously asserting an equitable interest in the Montana utility assets which were and are a necessary and essential part of the confirmed plan of reorganization. The preliminary injunction will preserve the rights of the debtor and creditors who relied upon the plan and thus preserve the status quo. If the McGreevey class wishes to preserve its alleged pre-petition claims, it must do so in the bankruptcy forum where it initially sought relief by filing their proofs of claim and seeking permission to tile an adversary proceeding to assert its rights. It is in the public interest to preserve the integrity of the bankruptcy {*24} process from collateral attack post-confirmation. Accordingly, for all the above reasons, a preliminary injunction must be issued against the McGreevey class enjoining the class from continuing the litigation in Cause No. DV-05199, presently pending on removal in the Montana U.S. District Court. n4

- - -Footnotes- - -

n4 While not raised as an issue, by either party, since the alleged McGreevey class claims exceed $ 5 million dollars in value, the jurisdiction of state court is highly questionable due to the passage of the "Class Action Fairness Act of 2005", P.L. 109-2, February 18, 2005, 119 Stat. 4, Sec. 4. Federal District Court Jurisdiction for Interstate Class Actions.

- - -End Footnotes- - -

**IT IS ORDERED:**

1. The plaintiffs Margaret A. McGreevey, Jo Ann Barkell and Joseph Martelli, on behalf of themselves and the class of similarly situated plaintiffs, are hereby preliminarily enjoined from further prosecution of Cause No. DV-05199, filed against Montana Power company, a Montana corporation, Northwestern Corporation, a Delaware corporation {*25} and the Clark Fork and Blackfoot LLC, a Montana Limited Liability company, defendants, presently pending in the Montana U.S. District Court, until further Order of this Court, with leave of the plaintiffs NOR and CFB to seek an award of attorneys' fees and costs.

DATED this 25th day of October, 2005,

BY THE COURT

HON. JOHN L PETERSON

United States Bankruptcy Judge District of Delaware

**NORTHWESTERN CORPORATION AND CLARK FORK AND
BLACKFOOT, LLC vs. MARGARET A. MCGREEVEY,** *et al.*

In re: NORTHWESTERN CORPORATION, Debtor. NORTHWESTERN CORPORATION and CLARK FORK AND BLACKFOOT, LLC, Plaintiffs, -vs- MARGARET A. MCGREEVEY, JO ANN BARKELL, and JOSEPH MARTELLI, on behalf of themselves and the class of similarly situated individuals, Defendants.

Chapter 11, Case Nos. 03-12872 (JLP), Adv. No. 05-52525 (JLP)

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

2005 Bankr. LEXIS 2146

October 25, 2005, Decided

**COUNSEL:** {*1} For Northwestern Corporation and Clark Fork and Blackfoot LLC, Plaintiff: Dennis A. Meloro, Greenberg Traurig, Wilmington, DE; William E. Chipman, Jr., Greenberg Traurig, LLP, Wilmington, DE.

For McGreevey Class Action Claimants, Defendant: Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE.

For Northwestern Corporation and Clark Fork and Blackfoot LLC, Counter-Defendant: Dennis A. Meloro, Greenberg Traurig, The Nemours Building, Wilmington, DE.

For Northwestern Corporation aka Northwestern Public Service aka The Montana Power, L.L.C. aka Northwestern Energy, L.L.C. aka Northwestern Energy-SD/NE aka Northwestern Energy-Montana, Debtor: Charles Michael Terribile, William E. Chipman, Jr., Greenburg Traurig LLP, The Brandywine Building, Wilmington, DE; Dennis A. Meloro, Scott D. Cousins, Victoria Watson Counihan, Greenberg Traurig, The Nemours Building, Wilmington, DE; Evelyn J. Meltzer, Pepper Hamilton LLP, Hercules Plaza, Wilmington, DE; Monica Leigh Loftin, Paul D. Brown, Greenberg Traurig, LLP, The Nemours Building, Wilmington, DE; Robert Lee Striker, Leonard Street and Deinard, Minneapolis, MN; William Pierce Bowden, Ashby & Geddes, Wilmington, {*2} DE.

Mark S. Kenney, U.S. Trustee, Office of the U.S. Trustee, Wilmington, DE.

For OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Creditor Committee: Charlene D. Davis, Eric Michael Sutty, GianClaudio Finizio, The Bayard Firm, Wilmington, DE; Donna L. Harris, Cross & Simon, LLC, Wilmington, DE; John C. Phillips, Jr, Phillips, Goldman & Spence, Wilmington, DE.

**JUDGES:** JOHN L. PETERSON, United States Bankruptcy Judge.

**OPINION BY:** John L. Peterson

**OPINION:** *MEMORANDUM OF DECISION and ORDER*

In Cause No. 05-52525, Plaintiff Northwestern Corporation ("NOR") filed an adversary complaint and objections to claims against the defendants Margaret A. McGreevey, *et al.*, who represent a class of former shareholders of the Montana Power Company ("MPC") which seek damages and other relief against a number of individuals and entities arising out of the divestiture of MFC. The McGreevey class filed an action on August 11, 2005, styled *McGreevey, et al v. MPC, NOR and the Clark Fork and Blackfoot LLC* ("CFB"), as defendants, Cause No. DV-05199, Montana Second Judicial District Court, Butte-Silver Bow County, Montana, seeking a judgment to impress a constructive or equitable trust on utility assets {*3} of the NOR purchase in 2002 from MPC, as more fully explained herein. NOR has removed the action to the United States District Court for the District of Montana, where it is now pending on McGreevey's motion for remand.

The present action seeks to enjoin the McGreevey state court action on the basis that it violates provisions of the confirmed chapter 11 plan of reorganization of NOR, has no basis in law or fact and seek an award of attorney's fees and costs. The matter is before this Court on NOR's Motion for Order to Show Cause why a Permanent or Preliminary Injunction should not be issued enjoining the continued prosecution of the cause DV-05199. Hearing on the Motion was held October 19, 2005, with counsel for each party present. Each party has filed pre-hearing memoranda in support of their respective positions and oral argument was made by counsel at the hearing. At the conclusion of the hearing the Court took the matter under advisement and is now prepared to rule.

The gravamen of the dispute is based on NOR's purchase of the utility assets, namely the transmission and distribution system of the MPC, under a Unit Purchase Agreement ("UPA") dated September 29, 2000, between {*4} NOR, as Buyer and Touch America Holdings, Inc., MPC and MPC LLC as sellers. One of the provisions of the UPA (sec. 2.23) required the sellers to obtain the affirmative vote of the holders of record of at least 2/3rds of the outstanding common stock of MPC approving the sale. While the McGreevey state court complaint alleges MPC wrongfully sold "all or some of its assets without obtaining shareholders approval in violation of § 35-1-823, MCA", that allegation is not true as to the purchase of the utility assets of MPC by NOR because on October 2, 2000, MPC and NOR announced the sale, and MPC represented in its 8-K filing with the SEC that purchase needed approval of MPC's shareholders, which MPC sought and received n1.

- - -Footnotes- - -

n1 Allegations from *Plan Trust of Touch America Holdings, Inc. v. Goldman, Sachs et al.* (DV-04-250), attached as an agenda item.

- - -End Footnotes- - -

In the McGreevey class Fourth Amended Complaint, Cause No. DV-01-141, Montana Second Judicial District, Butte Silver Bow County, now pending in U.S. District Court, {*5} attached as a hearing agenda item, the plaintiff alleges as true allegations in paragraph 6, p. 7, and paragraph 9(c), p. 9, as follows:

7. The final step of the original integrated plan to exit the energy business involved selling defendant Montana Power company's gas and electric distribution system to Northwestern Corp. for more than $ 1 billion, and then converting the old company into Touch America, Defendant Montana Power Company's telecommunication subsidiary. Defendant Montana Power Company has merged Defendant Montana Power Company into a Montana Power L.L.C., a subsidiary of Touch America Holding with Montana Power LLC being the surviving entity. The Montana Power L.L.C. entity has been sold to Northwestern Corp., leaving Touch America Holdings with only two companies, those being Touch America, Inc. And Tetragenics Co., which develops computer based monitoring systems.

Under the scheme, shareholders of Defendant Montana Power Company have or will become shareholders of Touch America Holdings.*** 9. (C) As a final phase, Defendant Montana Power agreed to sell its transmission facilities to Northwestern Corp. and guaranteed that Montana Power Company would {*6} either obtain shareholder approval or pay $ 10 million liquidated damage sum to Northwestern Corp. (Emphasis added).

It is noteworthy this Complaint notes lack of shareholder's approval on divestiture of the generation, coal and oil and gas businesses, and independent power production licenses as a prime claim for relief, but does not assert such lack of shareholder approval on the Northwestern sale of the energy component. Moreover, nothing is alleged that the Northwestern purchase was somehow clouded with fraud. In the Memorandum of Understanding ("MOU") in Cause DV-01-141, contained in NOR's Motion for Order under **Rule 9019**, NOR noted it was joined in cause DV-01-141 to cover any judgment against NWE, because the McGreevey class had filed Proof of Claim No. 744 against NOR asserting the assets of NWE LLC were transferred to NOR in violation of fraudulent transfer law. The MOU covered the D & O policies of Montana Power Company, which were to contribute $ 67,000,000.00 to the settlement fund with attendant full release of the claims. It was not approved, but the reason is not in this record. Thereafter, upon stipulation of the parties, the Bankruptcy Court approved a stipulation {*7} that the McGreevey claimants "shall have until 4:00 p.m. (EDT") on August 13, 2004, to file their objections to the Debtor's proposed plan." The stipulation was signed by the parties on August 2, 2004. The class failed to file any objection. The amended plan was confirmed with this provision (p. 62):

3. Binding Effect. In accordance with **section 1141(a) of the Bankruptcy Code**, the Plan and its provisions shall be, and hereby are, binding upon the Debtor, any Person acquiring or receiving a distribution under the Plan, any entity issuing securities under the Plan, any lessor of property to the Debtor, any lessee from the Debtor, any creditor of the Debtor and any holder of a claim against or Equity interest in the Debtor, and their respective successors and permitted assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted or rejected the Plan, or will or will not receive a distribution under the Plan" (Emphasis added).

Thus the MPC shareholders, now represented by the McGreevey class, approved the sale by over 2/3rd of the outstanding shares voting affirmatively {\*8} in favor of the UPA, thus satisfying the provisions of § 35-1-823 n2. Nevertheless, the McGreevey class now seeks an order avoiding the transfer and directing the return of the utility assets as being fraudulent, with an intentional hindrance of creditors, unjust enrichment, rendering CFB insolvent, so as to impose under the provisions of the Montana Uniform Fraudulent Transfer Act, §§ 31-2-328(3) and (4), 333 (1)(a) and (b), and 334(1), an actual and constructive trust in the Montana utility assets held by NOR for the benefit of the MPC shareholders.

- - -Footnotes- - -

n2 No basis is alleged in the state court complaint which resulted in an order in that court establishing the McGreevey class in Cause DV-05199 pursuant to Mont. R. Civ. P. (Mont.) Rule 23 or 23.1. Certainly it could not certify as a violation of § 35-1-823.

- - -End Footnotes- - -

The UPA provided that NOR would pay for the utility assets the sum of $ 602 million dollars cash and assume MPC liabilities of just under $ 500 million, for a total consideration of $ 1.1 billion dollars. {\*9} NOR made the payment pursuant to the UPA and assumed the debt in 2002 and on November 15, 2002, transferred the assets from CFB and NWE LLC to NOR.

The structure used to facilitate the transfer of the utility assets by MPC involved the creation of MPC LLC by MPC, and CFB together with Northwestern Energy LLC (NWli) by NOR, so that MPC LLC merged with CFB to take the assets to pass on to NOR through NWE. This has been called a "going flat" transaction or upstreaming the assets to NOR. McGreevey argues that when the CFB/N WE merger took place, CFB received no consideration for the transfer, except for the assumption of some debts, which thus left CFB insolvent. McGreevey contends that such structure invoked the provision of § 35-8-1203 MCA which provides "all debts, liabilities and other obligations of each [merging party] that are party to the merger become the obligations of the surviving entity", namely CFB, a limited liability company in which the shareholders of MPC never had an ownership interest. After MPC utility assets were merged in MPC LLC, that entity was joined in the UPA. State court legal action by McGreevey has

ensued against a number of entities, but as to NOR, it {\*10} joined that action as party defendant so that it would be responsible for any judgment which McGreevey might recover against NWE to the extent NWE is liable to satisfy the judgment. NOR's joinder by stipulation retained all legal defenses of NOR. Thus, the McGrccvcy class contends it has creditor status against NOR.

NOR filed for chapter 11 bankruptcy relief in September, 2004. In the case, McGreevey filed two proofs of claim, to which objection has been filed by NOR. Moreover, McGreevey moved the bankruptcy court for relief from the automatic stay under 11 U.S.C. § 362 so it could file an adversary proceeding against NOR to establish the constructive trust. McGreevey's motion attached a specimen Adversary Complaint under the heading "In the United Stales Bankruptcy Court for the District of Delaware". After objection to the motion was filed by NOR claiming the claims allowance and disallowance procedure would govern and resolve the matter, the bankruptcy court, based upon the stipulation made by NOR when added as a defendant in the class action suit filed in 2001, would survive and thus the proper method to resolve the issues of alleged fraudulent transfer {\*11} would be to allow McGreevey to file the adversary complaint attached to their motion. However, that complaint was never filed. Moreover, the McGreevey class never filed any objections to the Second Amended Plan of Reorganization asserting the constructive trust to the utility assets, and thereby preserving their legal position.

Ironically, another creditor, Magten Asset Management Corp. ("Magten") a holder of "QUIP" debentures assumed by NOR pre-petition, asserted the very same constructive trust/fraudulent conveyance position as McGreevey. In the order confirming the plan, the presiding Bankruptcy Judge Case stated:

"The court hereby finds that the going flat' transaction is all of one transaction and but for the going flat' transaction the Debtor would have no liability on the QUIPS notes."

In addition, Judge Case found that Magten, like McGrccvcy in the state court action, asserted "in rem" property interests in the Montana assets and that such assets were being held in a constructive trust for the benefit of the QUIPS holders. Judge Case found that Magten

"took no action to impose a constructive trust in the Montana assets and presented no evidence whatsoever {\*12} as to why they should be entitled to a constructive trust with respect to the Montana assets . . .

Moreover Magten . . . failed to cite a statute or case in support of their in rem property interest. The court finds persuasive Section 7 of the Uniform Fraudulent Transfer Act, as adopted in Montana, which contemplates that money damages are an adequate remedy for fraudulent transfer claims. Accordingly, the court finds no constructive trust has been established and money damages are an appropriate remedy for the holders of the QUIPS Litigation Claims."

The Court concluded the QUIPS notes were nothing more than general unsecured claims under section 7.5 of the plan, and indeed the confirmed plan specifically provides for such treatment in Class 8 of the plan.

It is noteworthy here, that unlike Magten, McGreevey made no effort whatsoever to establish a constructive trust from the "going flat" transaction, in the bankruptcy court, pre-confirmation. McGreevey now claims under fraudulent conveyance/constructive trust theory that claim survived the plan process and passed through unaffected due to a provision in the confirmed plan, sec. 5:13b, which provides:

"Except as otherwise {*13} expressly provided in this plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and one Additional Indemnities, shall not be released from any and all claims and causes of action arising under Sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy code or similar claims or cause of action arising under state or any other law, including, if applicable, claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego claims, as a consequence of transactions, events or circumstances involving or affecting the Debtor (or any of its predecessors or any of their respective businesses or operations that occurred or existed prior to the Effective Date."

The McGreevey argument may carry some weight if they had a viable fraudulent conveyance action under the Montana Fraudulent Conveyance Act. They do not.

The corporate mechanisms established by the seller MPC and the buyer NOR, mat is, the creation of MPC LLC, CFB and NWR LLC, were established to separate the MPC utility assets from the telecommunication assets of Touch America ("TA") so as to allow MPC to divest and sell the utility {*14} assets separate and apart from the telecommunication assets, which were retained by TA and MPC. McGreevey's argument that CFB was left insolvent is a fiction which exalts form over substance. The substance of the transaction, under the UPA, concurred in by the MPC shareholders, plainly provided for the sale and purchase of the utility assets between MPC

and NOR for $ 1.1 billion dollars. That sum was paid and received by MPC for its benefit and the benefit of its concurring shareholders. That feet is a given! Thus, when the transaction was completed by November 15, 2002, and the assets passed on to NOR through the various limited liability companies, the debtor/creditor relationship between NOR and MPC and its shareholders was satisfied, and therefore terminated. As a result, when NOR sought bankruptcy relief under chapter 11, MPC and its shareholders were no longer a creditor of NOR. This situation is fatal to the McGreevey class's state court action under the Montana Fraudulent Transfer Act as a matter of law. It is clear that in order for a party to seek the remedies under § 31-2-339, by the express definition of § 31-2-328(3) and (4) the creditor/plaintiff must have a claim, {*15} i.e., right to payment, as a predicate to maintain the action. It is further clear from the undisputed facts here that the McGreevey class does not have such claim, and is thus not a creditor because the UPA was satisfied by NOR's payment. As Judge Case held, and as I adopt, the "going flat" transaction is "all one transaction". The mechanism of creation of LLC's to effect the transfer and payment was indeed all one transaction, and it defies logic to argue otherwise. The McGreevey class simply cannot parse one aspect of the transfer and call it fraudulent. That would stand the confirmed plan of reorganization on its head, for the entire basis of the chapter 11 plan rested upon the utilization, implementation and consummation of the acquired Montana utility assets. The Montana court litigation now pending in the U.S. District Court has thus no basis for relief in law or fact. The claims filed by the McGreevey class in the bankruptcy case have no merit.

It is a well established principle of bankruptcy jurisprudence that an alleged creditor which files a claim in a bankruptcy case triggers the process of "allowance and disallowance of claims", thereby subjecting that person to the bankruptcy {*16} court's equitable powers. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *Gardner v. New Jersey*, 329 U.S. 565, 573, 67 S. Ct. 467, 91 L. Ed. 504 (1947). *In re Carnell Construction Corp.*, 424 F.2d 296, 298 (3rd Cir. 1970) (quoting *In re Beasley-Gilbert's, Inc.*, 285 F.Supp. 359, 361 (S.D. Ohio 1968)) plainly holds:

"It is settled that a creditor who proves a claim submits himself to the summary jurisdiction of the Bankruptcy court in respect of preferences or voidable transfers, including the jurisdiction of the Bankruptcy Court to enter a monetary judgment or order a return,"

Moreover, it is axiomatic that a bankruptcy court possesses the inherent authority to enforce its own

orders, such as an order confirming a chapter 11 plan of reorganization. *In re Continental Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. Del. 1999); *see, also,* F.R.B.P. Rule 3020(d). Finally, to preserve the plan post-confirmation by the bankruptcy court, *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154 (3rd Cir. 2004) and *In re Pegasus Gold Corporation*, 394 F.3d 1189 (9th Cir. 2004) {*17} hold "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold jurisdiction over the matter." Not only is there a close nexus in the cause *sub judice*, there is complete nexus for this Court to entertain jurisdiction to preserve the implementation and consummation of the plan for the plan creditors where, as here, the McGreevey class seeks erroneously, and without legal basis, to upset the entire underpinnings of the confirmed plan or reorganization by asserting a constructive trust over the Montana utility assets which form the bases of the success of the plan and are assets of the bankruptcy estate. This is so, because a person subject to constructive trust which arises under Montana state law, being involuntary in nature, has a duty to convey it to another on grounds that the person holding bare legal title would be unjustly enriched if he were permitted to retain it. *In re Estate of McDermott*, 2002 MT 164, 51 P.3d 486, 310 Mont. 435 (2002). That would be an unjust result in this case where full consideration under the UPA was paid by NOR.

It is also well established that where a creditor or person files {*18} a proof of claim, and has the opportunity to contest the disclosure statement or proposed plan of reorganization particularly to assert a constructive trust or fraudulent conveyance action and does not do so in the bankruptcy case, when it could or should have done so, is barred from asserting that claim in another forum. The confirmed plan and order control under **11 U.S.C. § 1141**, defining the effect of confirmation, and acts like a contract that binds the parties who participate in the bankruptcy case or should have participated in the case. *Knupfer v. Wolfberg (In re Wolfberg)*, 255 B.R. 879 (Bankr. 9th Cir. 2000); *Eastern Air Lines, Inc. v. Brown & Williamson Tobacco Corp. (In re Ionosphere Clubs, Inc.)*, 262 B.R. 604 (Bankr; S.D. N.Y. 2001). It is undisputed that the McGreevey class participated in the debtor's chapter 11 case by filing proofs of claim and a motion for relief from stay to file an adversary proceeding in the bankruptcy case, which they did not pursue. Consequently, now asserting after confirmation of the plan in a state court forum, that the Montana utility assets were not property of the bankruptcy estate n3, the McGreevey class is precluded from litigating that issue in the state court action because {*19} they

failed to take any steps to raise the issue before the court and litigate to conclusion their contentions prior to confirmation. *Miller v. U.S.*, 363 F.3d 999 (9th Cir. 2004): *In re PWS Holding Corp.*, 303 F.3d 308, 315 (3rd Cir. 2002); *Celotex Corp. v. Edwards*, 514 U.S. 300, 313 (1995) ("Respondents chose not to pursue this cause of action [appeal of the bankruptcy court's decision], but instead to collaterally attack the Bankruptcy Court's **section 105** injunction in the federal court of Texas. This they cannot be permitted to do without undercutting the orderly process of law."); *Haskell v. Goldman, Sachs & Co. (In re Genesis Health Ventures, Inc.)*, 324 B.R. 510, 521 (Bankr. Del. 2005) ("The application of res judicata, or claim preclusion, bars a party from litigating a claim that it would have raised or did raise in a prior proceeding in which it raised another claim on the same cause of action"). The excuse for not pursuing the adversary proceeding, filing objection to plan so as to raise the constructive trust issue, as Magten did, was that a proposed settlement was on the table dealing with the availability of MPC D & O insurance policy proceeds {*20} to be funneled to the McGreevey class, which proposal was later rejected by the Montana U.S. District Court since title to the proceeds is in issue. Such is a weak and unacceptable excuse at best since the McGreevey class could still have pursued its adversary proceeding if it truly believed it had merit, or at a minimum requested a delay in the confirmation process until the settlement issue was resolved. It did neither.

- - -Footnotes- - -

n3 **Section 1141(b)** provides: "Except as otherwise provided in the plan or order confirming the plan, the confirmation of a plan vests all property of the estate in the debtor."

- - -End Footnotes- - -

It is the position of NOR that plan provisions also bar the pending state court action because the McGreevey class claims were channeled into a D & O Trust, and the claims are thus discharged as to NOR with an attendant injunction against the McGreevey class allowing it to pursue their remedy in another forum. Arguing that the McGreevey class disagreement with that position is misplaced, NOR states if the McGreevey class {*21} did not like such plan treatment it should have filed an appropriate objection to confirmation of the plan, which it did not do. NOR's argument, based on the plan language of the plan provisions (provisions L0.5(a) and (e), 13.1, 5.13(b), 1.47 and 4.12) has merit, particularly where the

McUreevey class was served with the second amended plan, and did not seek any clarification from the court during the confirmation hearing by way of objection, as to the plan's intent, and how it would affect its constructive trust claim, particularly in light of NOR's position that the MPC D & O policies were not property of NOR's estate. In sum, the McGreevey class slept on its rights. However, due to my finding and conclusion that the McGreevey class was not and is not a creditor of NOR pre-petition I need not pass on NOR's position. This is particularly true since the Bankruptcy Court specifically found that the "Montana assets are property of the estate" in confirming the plan.

*Rubin v. Pringle (In re Focus Media Inc.)*, 387 F.3d 1077, 1085 (9th Cir. 2004), involving a fraudulent conveyance action by a bankruptcy trustee to freeze potential estate assets, the court adopted the traditional test for {*22} preliminary injunction as follows:

To determine whether a preliminary injunction should issue, a court

> balances the plaintiff's likelihood of success against the relative hardship to the parties. To receive a preliminary injunction, [a plaintiff is] required to show either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests.

*Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) (internal citations and quotations omitted).

To establish a substantial likelihood of success on the merits, NOR must show that it will have a fair chance of success on the merits. *Id.* By reason of my conclusion that the McGreevey class was not and could not be a pre-petition creditor of NOR, it has no chance to establish a constructive trust under Montana's Fraudulent Transfer Act. NOR and its creditors and shareholders in the reorganized company will suffer immediate and irreparable harm if the McGreevey class {*23} is permitted to continue to prosecute the stale court action in any forum. Under settled law, where a party unilaterally violates a bankruptcy court order, that violation, standing alone, constitutes the only harm necessary for an injunction. *American Gen. Fin. v. Tippins (In re Tippins)*, 221 B.R. 11, 27-28 (Bankr. N.D. Ala. 1998); *In re Steffan*, 97 B.R. 741, 746 (Bankr. N.D. N.Y. 1989); *In re*

*McNeil*, 128 B.R. 603, 615 (Bankr. E.D. Pa. 1991). In sum, the McGreevey class cannot be permitted to "end run" the confirmation process and order confirming the plan by erroneously asserting an equitable interest in the Montana utility assets which were and are a necessary and essential part of the confirmed plan of reorganization. The preliminary injunction will preserve the rights of the debtor and creditors who relied upon the plan and thus preserve the status quo. If the McGreevey class wishes to preserve its alleged pre-petition claims, it must do so in the bankruptcy forum where it initially sought relief by filing their proofs of claim and seeking permission to tile an adversary proceeding to assert its rights. It is in the public interest to preserve the integrity of the bankruptcy {*24} process from collateral attack post-confirmation. Accordingly, for all the above reasons, a preliminary injunction must be issued against the McGreevey class enjoining the class from continuing the litigation in Cause No. DV-05199, presently pending on removal in the Montana U.S. District Court. n4

- - -Footnotes- - -

n4 While not raised as an issue, by either party, since the alleged McGreevey class claims exceed $ 5 million dollars in value, the jurisdiction of state court is highly questionable due to the passage of the "Class Action Fairness Act of 2005", P.L. 109-2, February 18, 2005, 119 Stat. 4, Sec. 4. Federal District Court Jurisdiction for Interstate Class Actions.

- - -End Footnotes- - -

**IT IS ORDERED:**

1. The plaintiffs Margaret A. McGreevey, Jo Ann Barkell and Joseph Martelli, on behalf of themselves and the class of similarly situated plaintiffs, are hereby preliminarily enjoined from further prosecution of Cause No. DV-05199, filed against Montana Power company, a Montana corporation, Northwestern Corporation, a Delaware corporation {*25} and the Clark Fork and Blackfoot LLC, a Montana Limited Liability company, defendants, presently pending in the Montana U.S. District Court, until further Order of this Court, with leave of the plaintiffs NOR and CFB to seek an award of attorneys' fees and costs.

DATED this 25th day of October, 2005,

BY THE COURT

HON. JOHN L PETERSON

United States Bankruptcy Judge District of Delaware

**MICHAEL S. FOX, AS LITIGATION TRUSTEE OF PERRY H. KOPLIK &
SONS, INC. vs. BANK MANDIRI F/K/A BANK DAGANG NEGARA, BANK
DAGANG NEGARA**

In re PERRY H. KOPLIK & SONS, INC., Debtor. MICHAEL S. FOX, as Litigation Trustee of PERRY H. KOPLIK & SONS, INC., Plaintiff, v. BANK MANDIRI, formerly known as BANK DAGANG NEGARA, BANK DAGANG NEGARA, Defendant.

Chapter 11, Case No. 02-40648 (REG), Adversary Proceeding No. 05-01136

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 Bankr. LEXIS 2822; 47 Bankr. Ct. Dec. 81

October 23, 2006, Decided

COUNSEL: {*1} For Michael S. Fox, Litigation Trustee of Perry H. Koplik & Sons, Inc., Plaintiff: Robert S. Friedman, Esq. (argued), Alison MacGregor, Esq., KELLEY DRYE & WARREN LLP, New York, New York.

For Bank Mandiri, formerly known as Bank Dagang Negara, Defendant: Carolyn B. Lamm, Esq., Francis A. Vasquez, Jr., Esq. (argued), Nicole Erb, Esq., WHITE & CASE LLP, Washington, D.C.

JUDGES: Robert E. Gerber, United States Bankruptcy Judge.

OPINION BY: Robert E. Gerber

OPINION: DECISION AND ORDER ON MOTION TO DISMISS

BEFORE: ROBERT E. GERBER

UNITED STATES BANKRUPTCY JUDGE

In this adversary proceeding under the umbrella of the chapter 11 case of Perry H. Koplik & Sons, Inc. ("Koplik"), plaintiff Michael S. Fox (the "Trustee"), the Litigation Trustee for the Koplik estate, seeks money damages from defendant Bank Mandiri for Bank Mandiri's failure to honor a letter of credit. Bank Mandiri moves, pursuant to **Fed. R. Civ. P. 12(b)(2)** and **12(b)(6)**, as made applicable to this adversary proceeding under **Fed. R. Bankr. P. 7012(b)**, to dismiss the complaint. Bank Mandiri asserts (breaking down some {*2} of its contentions into sub-points) that (1) the action is barred by reason of *res judicata*, as a consequence of legal proceedings in Indonesia; (2) comity requires respect for the proceedings in Indonesia (including proceedings that Bank Mandiri asserts ordered Bank Mandiri to suspend payment on the letter of credit), precluding consideration of the Trustee's claims here; (3) doctrines of collateral and judicial estoppel preclude the Trustee from relitigating issues already decided or pending in Indonesia; (4)

Koplik's Plan of Reorganization did not properly preserve this Court's retention of jurisdiction over the Trustee's claims; and (5) this Court lacks personal jurisdiction over Bank Mandiri, by reason of missteps by the Trustee in effecting service in the manner required under the Foreign Sovereign Immunities Act ("FSIA").

The motion is denied. Most of Bank Mandiri's defenses are deficient under the undisputed facts. The remainder raise, at best, material issues of fact. None warrants dismissal on the state of the record here.

Facts n1

- - -Footnotes- - -

n1 In the interests of relative brevity, the Court has omitted citations with respect to background facts, and has limited record citations to the most significant matters.

- - -End Footnotes- - -
{*3}

In March 1997, Koplik, a New York corporation in the paper milling business, entered into a contract with PT Citra Hutama Kertasindo ("Kertasindo"), an Indonesian company also in the paper milling business. Kertasindo wanted to purchase second-hand paper mill machines and equipment. The contract provided that Koplik would finance the purchase, on the condition that Kertasindo obtain a letter of credit backing up Kertasindo's payment obligations.

In January 1999, Kertasindo did so. It procured a letter of credit from Bang Dagang Negara ("BDN"), an Indonesian bank with a branch in New York; both branches are alleged to have played a role in the transaction. The Trustee alleges (and Bank Mandiri has not yet disputed, if it ever will) that following a merger, Bank Mandiri succeeded to BDN's obligations. Bank Mandiri asserts (and the Trustee has not yet disputed, if he ever will) that Bank Mandiri is 70% owned by the Republic of Indonesia, and hence is an "agency of

instrumentality of a foreign state" within the meaning of **Section 1603(b)** of the FSIA.

The letter of credit issued by BDN (the "Letter of Credit"), which was dated January 28, 1999, was in the amount of approximately $ 5.3 {*4} million. Kertasindo was obligated to pay Koplik, the Letter of Credit's beneficiary, upon receipt of the paper mill machines and equipment. But the Letter of Credit required Bank Mandiri to pay Koplik in the event of a default by Kertasindo.

On March 24, 1999 and April 4, 1999, Kertasindo received the paper mill machines and equipment, but defaulted on its obligation to pay Koplik. As a result, in May 1999, Koplik attempted to collect payment from Bank Mandiri under the Letter of Credit. However, Bank Mandiri declined to honor the Letter of Credit, and did not pay Koplik.

Thereafter, Koplik filed suit (the "Koplik Suit") against Kertasindo and Bank Mandiri in the Indonesian District Court of Surabaya, seeking to recover on the $ 5.3 million debt. In the Koplik Suit, the Indonesian District Court of Surabaya ruled that the Letter of Credit was binding, and ordered Bank Mandiri to pay Koplik the $ 5.3 million. Bank Mandiri then appealed to the Indonesian High Court (an intermediate appellate court), which, on September 11, 2000, "cancelled" the District Court's decision. Koplik then appealed the High Court's decision to the Indonesian Supreme Court, Indonesia's highest court. In a {*5} decision dated May 30, 2002 (the "First Indonesia Supreme Court Decision"), the Indonesia Supreme Court reinstated the District Court's decision, enforcing the Letter of Credit.

By a procedure that is not clear to this Court, Bank Mandiri then obtained further review by the Indonesia Supreme Court of the First Indonesia Supreme Court Decision. In a decision dated September 29, 2003 (the "Second Indonesia Supreme Court Decision"), the Indonesia Supreme Court vacated its earlier decision enforcing the Letter of Credit, on the stated ground that there was a defect in the power of attorney Koplik had issued to permit its Indonesia representative to sue. The power of attorney had to be acknowledged before a notary, and Koplik had done so. But the acknowledgment of the power of attorney was lacking a second level of authentication, to be issued by the Indonesian Consul in New York. n2

- - -Footnotes- - -

n2 Koplik, as a New York corporation, was required to proceed by a representative in the Indonesian courts, by rendering a power of attorney to an individual with the authority to participate in such courts. Koplik executed a power of attorney, which was duly executed, with the proper acknowledgment required under New York law. However, the acknowledgment was insufficiently "legalized." The Indonesia Supreme Court declared, in the Second Indonesia Supreme Court Decision:
b. Whereas to be able to act before the [Indonesia] court, the legal entity should be represented by a person who has capacity to act for and on behalf of Perry H. Koplik & SonsInc. [sic.] in accordance with the applicable law of the State of New York, and such a person may render an authority to another person to represent him at the Indonesian courts by rendering a power of attorney in the form required by the law applicable in the State of New York and finally legalized with the Officer of the Indonesian Consul in that area; c. Whereas the power of attorney dated July 28, 1999 from Alvin Siegel (Executive Vice President and Chief Operating Officer of Perry H. Koplik & Sons, Inc.) to Samuel Willendra has been legalized by the Public Notary in New York, but the signature of Alvin Siegel has not been legalized by the Indonesian Consul in New York, so it cannot be used as a legal basis for Samuel Willendra to convey the power to O.C. Kaligis, SH to commence an action in the Indonesian courts; d. Whereas for this reason, O.C. Kaligis, SH and associates who received a special power of attorney from Samuel Willendra . . . cannot not [sic.] serve as the attorney of Perry H. Koplik & Sons Inc. to commence an action, and accordingly the action instituted by O.C. Kaligis, SH and associates must be declared unacceptable; e. Whereas by the unacceptability of the Plaintiff's claim for formal reason, the claims instituted by Defendant III in the Counterclaim must also be declared unacceptable.
Second Indonesia Supreme Court Decision at 30-31. There is no indication in the record that the Indonesia courts provided any opportunity to cure the procedural defect.

- - -End Footnotes- - -
{*6}

The failure to provide this second level of authentication -- similar or identical to what New York practitioners refer to colloquially as a "notarial flag," which would attest to the fact that the notary was, in fact, a notary -- resulted in Koplik's inability to recover on a $ 5.3 million letter of credit that the Indonesia Supreme Court had just ruled, in the First Indonesia Supreme Court Decision, should be enforced. The determination in the Second Indonesia Supreme Court Decision had nothing whatever to do with whether the Letter of Credit had been duly issued; whether its requirements for funding had been satisfied; or whether there were other principles of law under which a bank issuer could be released from its contractual duty to pay under a letter of credit. Significantly, there is no indication, in the Second Indonesia Supreme Court Decision, that it found fault with respect to the merits of its earlier determination, or the determination of the District Court of Surabaya, that payment on the letter of credit is, indeed, due. This Court determines, as a fact or mixed question of fact and law, that the Second Indonesia Supreme Court Decision was not on the merits.

There {*7} is, in addition, another litigation in Indonesia related to this controversy. A separate litigation (the "Kertasindo Suit") was initiated by Kertasindo, the principal obligor, with respect to the underlying purchase and sales contract between Koplik and Kertasindo. On July 15, 2003, the Indonesian District Court of Surabaya issued a decision (the "Kertasindo Decision") holding that the underlying sale contract was void for fraud, declaring the Letter of Credit null and void, and ordered Bank Mandiri "to suspend the payment" on the Letter of Credit "until the judgment for this case has been final, binding and enforceable . . . ." n3 It is unclear to this Court, based on this state of the record, as to the extent to which this determination took into account earlier rulings as to the merits of the Surabaya District Court and the Indonesia Supreme Court in the First Indonesia Supreme Court Decision. In June 2004, Koplik appealed the Kertasindo Decision, and so far as the record reflects, the appeal is currently pending in the Indonesian courts.

- - -Footnotes- - -

n3 Sardjono Decl. Ex. B at 120-21, 128.

- - -End Footnotes- - -
{*8}

Meanwhile (and overlapping in time, in part, events described above), Koplik became the subject of a bankruptcy case in the United States. On March 11, 2002, Koplik's creditors filed an involuntary chapter 7 case against Koplik in this Court. Shortly thereafter, pursuant to a Stipulation and Order entered in April 2002, an order for relief was entered in the involuntary case, and Koplik's chapter 7 case was converted to a case under chapter 11. In April 2003, this Court confirmed Koplik's Fifth Amended Chapter 11 Plan of Reorganization (the "Plan"), pursuant to which the Trustee was appointed.

In February 2005, the Trustee commenced this adversary proceeding against Bank Mandiri for failure to honor the Letter of Credit. The present motion followed.

Discussion

I.

Res Judicata

Bank Mandiri asserts in its Motion to Dismiss that under principles of *res judicata*, the Second Indonesia Supreme Court Decision bars this Court from allowing Koplik's claims to proceed. This Court does not agree.

This Court's determination of potential *res judicata* overlaps, in part, with its consideration of principles of comity. If, on the one hand, the requirements for applying {*9} *res judicata* would not be satisfied even if the assertedly binding decision had been issued by a United States court, there would be no need to address comity. But if, on the other hand, a litigant sought to invoke *res judicata* based on the substantive determination of a foreign court, an American court would necessarily have to consider whether comity requires respect for the foreign decision. The Court considers these in Parts I(A) and I(B), respectively.

A.

Here, as a fact or mixed question of fact and law, this Court has determined that the Second Indonesian Supreme Court decision was not on the merits. As previously noted, the Second Indonesia Court Decision was not based on substantive analysis of the Letter of Credit itself, or of whether the Letter of Credit had been duly issued; whether its requirements for funding had been satisfied; or whether there were other substantive legal bases under which an issuer bank might be released from its contractual duty to pay under a letter of credit once its funding requirements had been satisfied. Rather, Koplik was unable to assert its alleged contractual rights by reason of a classic procedural defect -- the lack of a consular {*10} flag on a duly acknowledged power of attorney that without dispute had been executed.

The requirement that the judgment for which preclusion is sought be based on the merits is universal

among American courts. n4 Under these circumstances, Bank Mandiri could not invoke *res judicata* based on the Second Indonesia Supreme Court Decision even if a decision of that character had been issued by an American court. n5

- - -Footnotes- - -

n4 *See, e.g., Indep. Party of Ark. v. Priest*, **907 F. Supp. 1276, 1280 (E.D. Ark. 1995)** (restating the rule that *res judicata* bars relitigation of a claim if the prior judgment was a final judgment on the merits); *Sclafani v. Story Book Homes, Inc.*, **294 A.D.2d 559, 743 N.Y.S.2d 283, 283 (2d Dep't 2002)** ("Where a dismissal does not involve a determination on the merits, the doctrine of *res judicata* does not apply.") (citing *Maitland v. Trojan Elec. & Mach. Co.*, **65 N.Y.2d 614, 480 N.E.2d 736, 491 N.Y.S.2d 147 (N.Y. 1985)** and *Hoey v. Kuchler*, **249 A.D.2d 365, 671 N.Y.S.2d 487 (2d Dep't 1998));** *State v. Roark*, **2005 Ohio 1980, 2005 WL 983042, at *2 (Oh. Ct. App. 2005)** (same); *A.L. Kornman Co. v. Metro. Gov't of Nashville & Davidson County*, **216 Tenn. 205, 391 S.W.2d 633, 636 (Tenn. 1965)** (same).
{*11}

n5 Likewise, basic *res judicata* law requires that any decision upon which it is based be a final determination. As the Kertasindo Decision is provisional and, so far as the record reflects, now the subject of an ongoing appeal, there is no basis for applying *res judicata* doctrine to that decision either.

- - -End Footnotes- - -

B.

The result would be the same even if Indonesian *res judicata* law were deemed to apply, and if Indonesia regarded a decision of the character of the Second Indonesia Supreme Court Decision to be on the merits. United States courts will grant comity only to foreign decisions that "[do] not violate American public policy." n6 Putting aside the issues with respect to whether any decision of the Indonesia courts would be worthy of comity in light of the showing of corruption in the Indonesia courts (discussed in Part II below), this Court believes that it would be contrary to American public policy to deny enforcement of a letter of credit without reaching the merits for an offense no greater than failing to secure a second authentication of a power of attorney, at least {*12} without opportunity and failure to cure.

- - -Footnotes- - -

n6 *Tahan v. Hodgson*, **213 U.S. App. D.C. 306, 662 F.2d 862, 864-67 (D.C. Cir. 1981)** (interpreting *Hilton v. Guyot*, **159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895)).** *See also In re Treco*, **240 F.3d 148, 158-161 (2d Cir. 2001)** (explaining the factors in **Bankruptcy Code section 304** (applicable to cases filed before the effective date of the amendments contained within the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005) that a bankruptcy court must take into consideration when deciding whether to afford comity to a foreign judgment); **RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 117 cmt. c (1971)** (stating that American courts should not grant comity to decisions that are "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought").

- - -End Footnotes- - -

Bank Mandiri's apparent argument that the misstep of failing to secure a second authentication on the power of attorney should {*13} be regarded as a substantive deficiency relieving it of a $ 5.3 million contractual obligation is offensive to this Court, and to American public policy. n7 Despite expert affidavits submitted by both sides, it is unclear whether Koplik would be barred from relitigating its claims under Indonesian *res judicata* law. But this Court ultimately need not make or await a finding in this regard. If Indonesian law would allow Koplik merely to cure the procedural defect, there would be no basis for invocation of *res judicata*. And if Indonesian law did not, a rule of law that provided for an escape from major contractual obligations (even those lacking the international sanctity of letters of credit), without regard to the merits of the underlying controversy, would not merit comity in American courts -- which value the predictability of contractual relations, and enforce contractual obligations when conditions to enforcement are satisfied.

- - -Footnotes- - -

n7 That is not to say, of course, that the Court finds offensive Bank Mandiri's desire to defend. Bank Mandiri is entitled to any and all defenses to an action to enforce a letter of credit, and will remain so entitled in this Court, as this adversary proceeding moves forward. The Court finds offensive only Bank Mandiri's reliance on the notion that it should be relieved of millions of dollars of contractual obligations solely by reason of the absence of a consular notarial flag.

- - -End Footnotes- - -
{*14}

Thus, to the extent Bank Mandiri bases its motion to dismiss on *res judicata* treatment for the Second Indonesia Supreme Court Decision, Bank Mandiri's motion is denied.

II.

Comity

The question as to whether to honor determinations of the Indonesian courts involves another issue as well. The Trustee contends that comity should not be granted to *any* of the Indonesian decisions because of corruption in Indonesian proceedings.

The decision to grant comity to the determination of a foreign court is a matter within this Court's discretion. n8 "[S]ince comity is an affirmative defense, the [moving party] carrie[s] the burden of proving that comity [is] appropriate." n9 The Second Circuit has declared that "[c]omity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." n10 But Bank Mandiri has not met its burden to satisfy this Court that the Indonesian court system will pass muster under the Second Circuit's standards.

- - -Footnotes- - -

n8 *See Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (finding that appellate courts review a trial court's decision to extend or withhold comity under an abuse of discretion standard); *French v. Liebmann (In re French)*, 320 B.R. 78, 81 (D. Md. 2004) ("As to whether the Bankruptcy Court should have declined to exercise its jurisdiction over the matter based upon the doctrine of international comity, that

question was a matter of that court's discretion which this Court reviews under an abuse of discretion standard.").
{*15}

n9 *Allstate*, 994 F.2d at 999.n10 *Cunard S.S. Co. Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 457 (2d Cir. 1985).

- - -End Footnotes- - -

The Trustee has introduced evidence of two basic types with respect to the alleged corruption in the Indonesian courts: (a) 12 articles, from newspapers and an encyclopedia, describing, with often shocking specifics, manifest corruption in the Indonesia courts, n11 and (b) a report from the United States Department of State to the same effect.

- - -Footnotes- - -

n11 *See Dallas Morning News*, Feb. 27, 2000 (Friedman Decl. Exh. G) (reporting that an "unusually fast ruling" from a local judge approving Indonesia's taxation of explicitly tax exempt entity "highlight[ed] Indonesia's weak adherence to rule of law, its checkered judiciary, crumbling central authority and pervasive corruption"; "Corruption here was systemic"; judge offered to give litigant a favorable ruling for $ 30,000, according to three separate sources); *The Straits Times (Singapore)*, Aug. 26, 2000 (Friedman Decl. Exh. H) ("Almost 80 percent of Supreme Court judges in Indonesia are tainted by bribes, according to the National Law Commission"; two Indonesia Supreme Court judges and a former judge had been declared suspects in a bribery case, though they denied wrongdoing; "Indonesia's justice system has been rated as one of the worst in the world"; vice- president of National Law Commission "hope[d] Attorney-General will take more action to clean up the Supreme Court"); *BBC News*, Aug. 30, 2000 (Friedman Decl. Exh. I) ("There are additional doubts over the ability of the Indonesian judicial system to conduct a fully fair trial"; "in six recent corruption cases . . . the prosecution lost each time"); *The Jakarta Post*, Jan. 16, 2001 (Friedman Decl. Exh. K) (reporting that no action was taken to combat the corruption; "[law enforcement problems] couldn't be settled because most law

enforcement officers still had poor moral integrity"; "[t]hat is what makes it easy for outsiders to interfere with judicial rulings"; "weak internal controls of judges' behavior was also a serious problem"; "improvement should begin with the justices at the [Indonesia] Supreme Court, and then be followed by high court judges and district court judges"; "the corrupted judiciary is one of the most complex problems facing the country"); *The Asian Wall Street Journal*, Dec. 18, 2001 (Friedman Decl. Exh. L) ("Indonesia's justice system has been badly broken for a generation. Not long ago, a senior lawyer in Jakarta claimed that up to 90% of court cases are decided by bribes to judges, prosecutors and other court officials"); *The New York Times*, Jun 21, 2002 (Friedman Decl. Exh. M) ("The decision by an Indonesian court to declare the local subsidiary of a large Canadian life insurance company bankrupt, over the company's objections and despite the fact that it made money [in prior] year [and was asserted to be solvent], ha[d] severely shaken the confidence of foreign investors [in Indonesia], who have grumbled for years about corruption in the judiciary"; according to foreign executives, "it is increasingly difficult to do business in Indonesia because the courts are often a marketplace where the sizes of bribes decide cases"; "The American ambassador to Indonesia . . . said publicly that reform of the courts and the legal system was the most important step Indonesia could take to attract new investment."); *The Washington Post*, Oct. 29, 2002 (Friedman Decl. Exh. N) ("[in Indonesia courts], bribery is rampant and favoritism the legal standard"); *The Jakarta Post*, Jan. 29, 2003 (Friedman Decl. Exh. O) ("The Indonesian Corruption Watch (ICW) disclosed . . . widespread corruption in the country's judicial system, involving a wide range of players, from justices of the Supreme Court to parking attendants at a district court"; "In a civil case at the district court or commercial court, or even in the Supreme Court, the patterns of corruption are similar to those in the legal process of a criminal case"; "And lastly, the Supreme Court must reform itself, [and] recruit clean justices..."); *The Straits Times (Singapore)*, Sep. 2, 2003 (Friedman Decl.

Exh. P) ("combating corruption and abuse of legal process in Indonesia" was as vital to its future as fighting terrorism"; "arbitration awards rendered outside Indonesia may be very difficult to enforce in Indonesian courts, especially if the losing party is Indonesian").

- - -End Footnotes- - -
  {*16}

With respect to the former, it is initially tempting to conclude that so many articles, all saying the same thing, warrant consideration and considerable reliance. Without a doubt, the articles, if admissible in evidence, would strongly support the Trustee's claims. But if introduced for the truth of the matter asserted (and this Court believes that here they plainly are), the newspaper articles must be excluded from evidence, as hearsay. It is settled law in this Circuit that "[n]ewspaper articles are simply not evidence of anything other than the fact they were published; they are not admissible to prove the truth of the matter asserted therein." n12

- - -Footnotes- - -

n12 *Tasini v. New York Times Co., Inc.,* **184 F. Supp. 2d 350, 357 (S.D.N.Y. 2002)** (Carter, J.); *accord Doe v. Karadzic*, 1997 **U.S. Dist. LEXIS 1073, No. 93 Civ. 878/1163 (PKL) (HBP), 1997 WL 45515, at *6 (S.D.N.Y. Feb. 4, 1997) (Pitman, J.).**

- - -End Footnotes- - -

However, the Trustee has put forward evidence in the second category as well, which is not subject to a valid {*17} hearsay objection. The Trustee points to a Country Report for Indonesia, issued by the U.S. Department of State for the year 2003 (the "State Department Report"), detailing corruption in the Indonesia court system. The State Department Report describes widespread corruption throughout the legal system, aggravated by low salaries paid to Indonesian judges and the pressure those judges face from other governmental authorities. n13 The State Department Report initially noted (as Bank Mandiri argues) that the Indonesian Constitution provides for judicial independence. But within the same sentence the State Department continued: "however, in practice, the judiciary remained subordinate to the executive and was often influenced by the military, business interests, and politicians outside of the legal system." n14 More

detailed discussion in the State Department Report was even more damning. n15

- - -Footnotes- - -

n13 2003 Country Reports on Human Rights Practices: Indonesia, DEPT. ST. REP., Feb. 25, 2004, at 12-15 (MacGregor Reply Decl. Exh. A).n14 *Id.* at 12.n15 *See id.* at 13 ("Widespread corruption continued throughout the legal system. During the year, Transparency International reported that the country was among the world's most corrupt, and, in October, the World Bank stated that endemic corruption in the country was compromising law and order. Bribes influenced prosecution, conviction, and sentencing in countless civil and criminal cases.") It went on to say:

In August, the Legal Review Journal investigated the buying of verdicts in corporate civil lawsuits at district courts, high courts, and the Supreme Court. Based on information obtained from leaked corporate memos and other sources, the Review published a list that estimated the "price of victory" in a court case. Prices ranged from as little as $ 8,300 at the Bandung District Court to as much as $ 600,000 at the Supreme Court."
*Id.* at 13.

- - -End Footnotes- - -
{*18}

The hearsay impediments to consideration to the newspaper articles do not apply to the State Department Report. In *Bridgeway Corp. v. Citibank*, n16 the Second Circuit addressed this issue squarely. It rejected an argument that a U.S. State Department Country Report, offered for a purpose essentially identical to the one for which the State Department Report has been offered here -- to establish that the Liberia's courts were "unlikely to render impartial justice" n17 -- was excludible as hearsay. n18 The *Bridgeway* court held, to the contrary, that the U.S. State Department Country Report was admissible under **Federal Rule of Evidence 803(8)(C)**, which allows the admission of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." n19

- - -Footnotes- - -

n16 **201 F.3d 134 (2d Cir. 2000)**.n17 *See id.* at 142.n18 *Id.* at 143-44.n19 *Id.* at 143. *See* **FED. R. EVID. 803(8)(C)**.

- - -End Footnotes- - -
{*19}

The Second Circuit went on to say:

Rule 803(8) "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies. 'Factual finding' includes not only what happened, but how it happened, why it happened, and who caused it to happen." The rule therefore renders presumptively admissible "not merely . . . factual determinations in the narrow sense, but also . . . conclusions or opinions that are based upon a factual investigation." n20

- - -Footnotes- - -

n20 *Id.* (citations omitted; ellipses in internal quotations in original).

- - -End Footnotes- - -

The Second Circuit then addressed how a court should deal with evidence in the form of factual findings admissible under **Fed. R. Evid. 803(8)(C)**. It held:

Once a party has shown that a set of factual findings satisfies the minimum requirements of **Rule 803(8)(C)**, the admissibility of such factual findings is presumed. {*20} The burden to show "a lack of trustworthiness" then shifts to the party opposing admission. n21

- - -Footnotes- - -

n21 *Id.* (quoting *Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir. 1998)).

- - -End Footnotes- - -

Here Bank Mandiri did not even try to attack the State Department's findings for lack of trustworthiness. Bank Mandiri's submissions were also notably silent in

disputing the presence of the pervasive corruption that the U.S. State Department found. The deficiencies in Bank Mandiri's submissions are relevant first for their failure to show "lack of trustworthiness" (thereby making the State Department Report admissible), and second for their failure to provide contrary evidence that would trump the facts and conclusions set forth in the State Department Report once admitted.

Thus the Second Circuit's determination in *Bridgeway*, on very closely similar facts, makes it plain that the State Department Report is admissible. While this Court necessarily must exclude the newspaper articles, it can and does rely {*21} on the State Department Report, prepared by area experts with no apparent axe to grind, n22 which presents a very disturbing picture. The Court also agrees with the Trustee's contentions that that the findings of the State Department Report are particularly applicable to the case at bar, as Bank Mandiri is an instrumentality of the Indonesian government -- and that the Indonesian courts in proceedings involving Koplik's battle against Bank Mandiri would be especially susceptible to influence from other arms of the government. n23

- - -Footnotes- - -

n22 The *Bridgeway* court noted, in this regard:
The Reports are submitted annually, and are therefore investigated in a timely manner. They are prepared by area specialists at the State Department. And nothing in the record or in Bridgeway's briefs indicates any motive for misrepresenting the facts concerning Liberia's civil war or its effect on the judicial system there.
*Id.* at 143-44. Likewise, Bank Mandiri has provided no basis for questioning the quality of the analysis, or motive, of the State Department here. n23 *See* Trustee Sur-reply at 13-15. However, the Court reaches the conclusions it does here under the Second Circuit authority, without reliance on *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 264 F. Supp. 2d 490 (S.D. Tex. 2003), *aff'd*, 364 F.3d 274 (5th Cir. 2004), relied upon by the Trustee. Though the court there did indeed decline to enforce a determination of the Indonesia courts preventing an Indonesian company from paying on an arbitration award, the *Karaha Bodas* court did not need to, and did not, rely on the argument also made

there based on corruption in the Indonesian courts. *See id.* at 501 n. 16.

- - -End Footnotes- - -
{*22}

Bank Mandiri puts forward some, but very limited, evidence to support its contention that comity should be granted to the Indonesian proceedings. But in that connection, it puts forward none to dispute the accuracy of the U.S. State Department's findings, or otherwise to dispute that corruption in the Indonesian courts is a matter of great concern. Bank Mandiri points out that the district court judges in Jakarta (where Koplik first brought suit against Bank Mandiri and where Kertasindo then brought suit against Koplik and Bank Mandiri) are considered to be some of the most qualified judges in Indonesia. And Bank Mandiri notes that the right to appeal an Indonesian district court's verdict is nearly automatic -- assertedly providing an additional measure of confidence with respect to the legitimacy of any proceeding there. But these matters do not go to the Trustee's real point -- that Indonesian judicial proceedings, at all levels, were and are affected by corruption, as practical matter, as to which judges' competence or litigants' theoretical rights to appeal are not determinative. n24

- - -Footnotes- - -

n24 Bank Mandiri also relies on a White House press release speaking to a joint statement between the presidents of the United States and Indonesia dealing with efforts to deal with the recent tsunami, to bring peace and stability to the region, and to fight terrorism. *See* Bank Mandiri R. Br. at 6, n.3. But the press release does not speak to the presence or absence of corruption in the Indonesian judicial system, and the vague comments in the press release as to efforts to "enhance cooperation on various justice-sector issues and related issues of mutual interest" do not address whether proceedings in Indonesia were or are tainted by bribery or other corruption, and whether corruption in the Indonesian judiciary was cured at the time of the Indonesian judicial proceedings on which Bank Mandiri relies, or, indeed, has been cured as of this day.

- - -End Footnotes- - -
{*23}

More to the point, Bank Mandiri asserts that comity should be granted because Koplik did not produce any affirmative evidence to show that either of the *specific* Indonesian proceedings was tainted by corruption. But Bank Mandiri's premise is defective in that regard, as Bank Mandiri fails to explain how or why the Indonesia Supreme Court reviewed its own decision, reversing it only at the eleventh hour, and on a basis that had been apparent, if it mattered, from the time of the earliest proceedings in the Indonesia district court. And Bank Mandiri fails to address how decisions on the merits could be reached in the Kertasindo action that were seemingly, if not plainly, contrary to those reached in the First Indonesia Supreme Court decision.

But in any event, evidence of corruption in the specific proceedings was not required in *Bridgeway*, by either Judge Chin or the Second Circuit. There Judge Chin of the district court not only declined to grant summary judgment in favor of the entity seeking to enforce the Liberian judgment on grounds of comity. He granted summary judgment *the other way*, and was affirmed by the Second Circuit in that regard. n25 The decision of each {*24} court was driven, in material part, by the State Department's generalized observations in its country report for Liberia (without addressing the particular dispute between Bridgeway and Citibank) that "corruption and incompetent handling of cases remained a recurrent problem." n26

- - -Footnotes- - -

n25 *See Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287-88 (S.D.N.Y. 1999) (Chin, J.), *aff'd*, 201 F.3d 134 (2d Cir. 2000).n26 *Bridgeway*, 201 F.3d at 138 (quoting the State Department Report). *See also Bridgeway*, 45 F. Supp. 2d at 287 (reporting the district court decision).

- - -End Footnotes- - -

Here the State Department Report and the inferences that legitimately can be drawn from it -- especially when coupled with the surrounding facts here (e.g., Bank Mandiri's status as an instrumentality of the Indonesian Government; the reversal of the decision in the First Indonesia Supreme Court Decision that Koplik could indeed enforce the Letter of Credit; and the proceedings {*25} in Kertasindo Action) are more than sufficient to support a discretionary determination by this Court that it should not grant comity to determinations of a court system of the type the State Department Report described. Especially since it is Bank Mandiri that has the burden of showing that comity should be granted, this Court is not in a

position to dismiss this case on motion, and declines to do so.

This Court emphasizes that its decision is not based on differences between various countries' legal systems or their substantive or procedural legal rules. Such are inevitable, and this Court, like others in this Circuit, normally and readily grants comity or assistance to foreign tribunals, even where their procedural practices or substantive law differ materially from our own. n27 But that presupposes that the foreign system, whatever its procedures or substantive law, is fair. n28 As in the Circuit Court decision in *Bridgeway*, this Court does not have to decide whether it would make its comity decision under New York or federal standards. Where, as unfortunately is the case here, the judicial system for which comity is sought has been shown to have systemic corruption, the Court {*26} cannot grant that judicial system's determinations comity under either state or federal law. As the Second Circuit held in *Bridgeway*, citing its earlier decision in *Ackermann v. Levine*, n29 under both New York statute and under the common law standard, "judgments rendered by a judicial system that fails to be impartial or to conform its procedures to due process are not enforceable." n30 Thus this Court is not in a position to dismiss this action based on deference to the Second Indonesia Supreme Court decision, or the Kertasindo decision, and will not do so. n31

- - -Footnotes- - -

n27 *See, e.g., Maxwell Commun. Corp. PLC by Homan v. Societe Generale (In re Maxwell Commun. Corp. plc)*, 93 F.3d 1036, 1050 (2d Cir. 1996) (approving, as a matter of international comity, deference to laws of England regarding voidable preferences in American chapter 11 case conducted in coordination with English proceeding, even though English law, unlike U.S. law, would require transferor to act with specific intent); *In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, --- B.R. ----, 2006 U.S. Dist. LEXIS 57595, 2006 WL 2338092, *2-*4 (S.D.N.Y. Aug. 11, 2006) (Rakoff, J.) (granting comity to Canadian mass tort claims resolution procedure, even though it did not grant a right to a jury trial).

{*27}

n28 *See, e.g., In re PSINet Inc.*, 268 B.R. 358 (Bankr. S.D.N.Y. 2001) (Gerber, J.) ("[T]his Court takes obligations of comity seriously, particularly where, as here, the

two legal systems involved, those of the United States and Canada, share common commercial values and *values of fairness and due process*.") (emphasis added).n29 **788 F.2d 830, 842 n.12 (2d Cir. 1986).**n30 *Bridgeway*, **201 F.3d at 141 n. 1.**n31 Nor will this Court stay this action to await developments in Indonesia, for the same reasons.

- - -End Footnotes- - -

At the least, Bank Mandiri is not entitled to dismissal on motion on comity grounds. The decisions by Judge Chin and the Second Circuit in *Bridgeway* n32 could be argued to suggest that this Court should rule more broadly -- that like Judge Chin, this Court should not just decline relief on motion to the party invoking comity, but should reject the application of comity in the case for all time. But this Court does not need now to decide whether Bank Mandiri deserves another opportunity to relitigate the comity {*28} issues it has raised here. It is sufficient, for purposes of this determination, for the Court to say that Bank Mandiri plainly has not established a basis for dismissal on comity grounds on motion. Each side can have a reservation of rights with respect to further matters down the road.

- - -Footnotes- - -

n32 Judge Chin did not just deny a motion for summary judgment premised on the existence of comity. He granted summary judgment the other way -- rejecting, as a matter of law, comity as a defense. The Second Circuit affirmed his ruling in all respects. *Bridgeway*, **45 F. Supp. 2d at 287-88,** *aff'd, Bridgeway*, **201 F.3d 134.**

- - -End Footnotes- - -

III.

Collateral and Judicial Estoppel

Bank Mandiri also argues that the Trustee is collaterally estopped from arguing that the Letter of Credit is valid and enforceable against Bank Mandiri because this issue was reached by the Surabaya District Court in the Kertasindo Decision, and that the Trustee is judicially estopped from proceeding here because Koplik participated {*29} in litigation involving these and closely related issues in Indonesia. The Court disagrees.

Collateral estoppel is not a bar to the Trustee for two separate reasons. First, the Kertasindo decision was

provisional and is the subject of a pending appeal, and each, by itself, bars collateral estoppel from being invoked. Second, and more fundamentally, this Court has determined, in Part II above, that the Kertasindo Decision is not entitled to comity. For this reason too, this Court cannot, and will not, apply collateral estoppel to any Kertasindo findings.

Similarly, the Court must reject Bank Mandiri's contention that the Trustee is judicially estopped from suing here by reason of Koplik's litigation in Indonesia. A similar argument was made, and rejected, in Bridgeway. The Second Circuit there noted that "[j]udicial estoppel 'prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding.'" n33 It continued:

"[a] party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) {*30} that position was adopted by the first tribunal in some manner." We have described the type of inconsistency required as a "clear inconsistency between [the party's] present and former positions." n34

And it went on to say that:

Defending a suit where one has been haled into court, and suing where jurisdiction and venue readily exist do not constitute assertions that the relevant courts are fair and impartial. Accordingly, we do not view Citibank's voluntary participation in Liberian litigation, *even as a plaintiff*, as *clearly contradictory* to its present position. n35

- - -Footnotes- - -

n33 **201 F.3d at 141** (quoting *Bates v. Long Island R.R.*, **997 F.2d 1028, 1037 (2d Cir. 1993)**). n34 *Id.* (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, **190 F.3d 1, 6 (2d Cir. 1999)** and *Maharaj v. Bankamerica Corp.*, **128 F.3d 94, 98 (2d Cir. 1977)**).n35 *Id.* (first emphasis added).

- - -End Footnotes- - -

Judge Chin, in his own analysis (which {*31} this Court believes was fully approved by the Second Circuit in the relevant part of its decision affirming him) held to the same effect, albeit somewhat more extensively. He expressly rejected a contention very

similar to that here -- that judicial estoppel should be invoked because Citibank voluntarily appeared in litigation in Liberia without then contending that the Liberian system of jurisprudence was defective in any way. In the absence of a showing that the litigant ever actually took a position that proceedings in the foreign court were impartial, Judge Chin found invocation of judicial estoppel unwarranted. He held, *inter alia*:

> Bridgeway has not demonstrated that the requirements of judicial estoppel have been met. Citibank never took the position in the Liberian proceedings that the Liberian courts are impartial and that the Liberian judicial system operates in accordance with the basic requirements of due process. That Citibank chose to defend itself in Liberia when sued surely does not mean that it waived any and all objections it might have to the fairness of the Liberian judicial system. Hence, Citibank cannot be said to have taken a position in a prior proceeding {*32} that is inconsistent with its position here. n36

- - -Footnotes- - -

n36 *Bridgeway*, 45 F. Supp. 2d at 283-84.

- - -End Footnotes- - -

Finally, each of Judge Chin and the Second Circuit reached the conclusions they did even though the party opposing comity had appeared not just as a defendant, but *also as a plaintiff.* n37

- - -Footnotes- - -

n37 *See id.* at 283; *Bridgeway*, 201 F.3d at 141.

- - -End Footnotes- - -

As in *Bridgeway*, Bank Mandiri's judicial estoppel contention is rejected.

IV.

Reservation of Postconfirmation Claims in the Plan

Bank Mandiri also argues that the Trustee's claims should be dismissed because Koplik's Plan did not specifically provide for the Court's retention of jurisdiction over this proceeding under **section 1123(b)(3)(B)** of the Code. n38 Koplik's Plan had expressly reserved the Court's jurisdiction over

postconfirmation {*33} claims, but did not specifically identify the Trustee's current claims against Bank Mandiri. n39

- - -Footnotes- - -

n38 **Bankruptcy Code section 1123(b)(3)(B)** provides, in part, that "[A] plan may provide for the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."n39 *See* Koplik's Plan of Reorganization, Article XI, § 11.03 ("Pursuant to **section 1123(b)(3) of the Bankruptcy Code**, the Litigation Trustee shall retain and may enforce any and all claims of the Debtor or the Estate, including, but not limited to, claims against governmental units.").

- - -End Footnotes- - -

Courts differ on how specific the language of retention and enforcement must be under **section 1123(b)(3)(B)**. n40 Despite this conflict among the courts, it has been held in this Court, as affirmed by the district court and the Second Circuit, that a debtor's plan of reorganization may reserve postconfirmation claims in general {*34} terms. n41 In *I. Appel*, the district court, and subsequently the Second Circuit, found a chapter 11 debtor's general reservation of rights to litigate postconfirmation claims to be satisfactory, and rejected the notion that specific causes of action had to be preserved in a plan of reorganization. n42 The *I. Appel* court found persuasive the *Ampace* line of cases, which rejected the requirement of the specificity of claims in the plan of reorganization. n43

- - -Footnotes- - -

n40 *See In re Ampace Corp.*, 279 B.R. 145, 157 (Bankr. D. Del. 2002) ("The courts are divided on how specific the language of retention and enforcement must be under § 1123(b)(3)(B) to adequately reserve a cause of action for adjudication at a later date."); *In re Goodman Bros. Steel Drum Co., Inc.*, 247 B.R. 604, 607 (Bankr. E.D.N.Y. 2000) ("Case law is divided on how specific language of retention and enforcement must be under [section] 1123(b)(3)(B).").n41 *See In re I. Appel*

*Corp.*, 300 B.R. 564, 569 (S.D.N.Y. 2003) (Marrero, J.) ("It is neither reasonable nor practical to expect a debtor to identify in its plan of reorganization or disclosure schedules every outstanding claim it intends to pursue with the degree of specificity that the [defendants] would require.").

{\*35}

n42 *See id.*n43 *Id.* at 568-69. *See, e.g.*, *Ampace*, 279 B.R. at 158 ("[T]here is nothing in [section 1123(b)(3)(B)] to suggest that the plan must specifically identify each and every claim and/or interest belonging to the debtor that may be subject to retention and enforcement.").

- - -End Footnotes- - -

In this case, Koplik's Plan expressly reserved this Court's jurisdiction over postconfirmation claims, but did not specifically identify and reference the Trustee's current claims against Bank Mandiri. Rather, like the plans in *I. Appel* and *Ampace*, Koplik's Plan contained a general statement on the court's retention of jurisdiction. It stated that:

> The Bankruptcy Court shall retain and have exclusive jurisdiction over all matters arising out of or relating to the Chapter 11 Case, including, without limitation . . . all claims (including claims arising in common law or in equity) against any Entity on account of any debt or other claim owed to or in the favor [of] the Debtor or its Estate. n44

- - -Footnotes- - -

n44 *See* Koplik's Plan of Reorganization, Article XIV, § 14.02(1).

- - -End Footnotes- - -

{\*36}

This reservation plainly reflected an intent to retain the right to bring postconfirmation claims on debts adjudicated in this Court. Additionally, as discussed in *Ampace*, the plain language of section 1123(b)(3)(B) does not require a plan to specify every claim; rather, section 1123(b)(3)(B) provides that the plan *may* do so. n45 The Court thus concludes that Koplik's Plan satisfactorily reserved this Court's retention of jurisdiction in this proceeding.

- - -Footnotes- - -

n45 *See Ampace*, 279 B.R. at 158.

- - -End Footnotes- - -

Bank Mandiri also makes another, different, judicial estoppel argument. It argues that judicial estoppel bars the Trustee from bringing his claims due to the non-disclosure of such claims in the Plan. Some bankruptcy courts have invoked judicial estoppel in order to prevent a debtor who has failed to disclose a claim *for his own benefit* from subsequently asserting that claim *after* emerging from bankruptcy. n46 As a party invoking judicial estoppel, Bank Mandiri must show that (1) the Trustee {\*37} or Koplik "advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." n47

- - -Footnotes- - -

n46 *See Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., New York Branch (In re Galerie des Monnaies of Geneva, Ltd.)*, 62 B.R. 224, 225 (S.D.N.Y. 1986) ("The bankruptcy court properly dismissed [the debtor's] attempt to recover preferential transfers after the debtor had previously told creditors voting on the reorganization plan that it knew of no such transfers."). *See also Rosenshein v. Kleban*, 918 F. Supp. 98, 104-05 (S.D.N.Y. 1996) ("The bankruptcy court approved [the plaintiffs'] plans of reorganization and discharged their debts on the basis of their incomplete disclosure of assets, thereby adopting their position. [The plaintiffs] now seek to assert the contrary position that they have claims against [the defendants]. This is precisely the sort of 'about-face' that undermines the integrity of the bankruptcy process. Therefore, the doctrine of judicial estoppel provides an alternative basis on which to grant summary judgment dismissing [the plaintiffs'] claims.").

{\*38}

n47 *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (quoting *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996)). *See also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997) ("By adopting a rule that requires

acceptance by the earlier tribunal of the litigant's statements, this court limits the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.").

- - -End Footnotes- - -

But Bank Mandiri did not show, or even allege, any facts that (1) the Trustee or Koplik "advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." Rather, Bank Mandiri's showing boils down to an assertion that "[g]iven the lack of any mention of a potential claim against Bank Mandiri prior to the institution of this lawsuit, the claims against Bank Mandiri are barred as a matter of law and should be dismissed." n48 As Bank Mandiri has satisfied neither requirement, {*39} judicial estoppel does not bar the Trustee's claims.

- - -Footnotes- - -

n48 Mot. to Dismiss at 13. Similarly, in its Reply Memorandum, Bank Mandiri simply states that "[t]he Trustee has not shown any reason, legal or otherwise, why he should be allowed to abuse the process by pursuing claims that were never disclosed in this case and has [sic.] already been litigated." Reply Mem. at 25-26.

- - -End Footnotes- - -

VI.

FSIA Requirements

Finally, Bank Mandiri asserts that this Court does not have personal jurisdiction over Bank Mandiri due to the Trustee's improper service. Bank Mandiri maintains, and the Trustee does not dispute, that the FSIA applies because Bank Mandiri is an instrumentality of Indonesia. n49 Bank Mandiri argues that this action should be dismissed because the Trustee assertedly failed to serve process in accordance with FSIA's requirements.

- - -Footnotes- - -

n49 The FSIA defines an "agency or instrumentality of a foreign state" as a separate legal entity (corporate or otherwise), owned in the majority by a foreign state, that is neither a citizen of a U.S. state nor a creation of a foreign state.

28 U.S.C. § 1603(b)(1)-(3). According to an affidavit provided on its behalf, Bank Mandiri is a separate legal entity that is 70% owned by the Indonesian Government, and is neither a citizen of a U.S. state nor the creation of a third country's laws. *See* Supp. Sardjono Decl. P 2 (being the merged bank of four other state-owned Indonesian banks, Bank Mandiri appears to be a separate legal entity in the way a bank in the United States would be); Supp. Sardjono Decl. P 3 (relying on information about stock ownership). Therefore, Bank Mandiri meets the requirements of **28 U.S.C. § 1603(b)**, and is an "agency or instrumentality of a foreign state." Understandably, Bank Mandiri does not contend that it is immune from jurisdiction here. The FSIA also provides that a foreign sovereign is not immune from U.S. jurisdiction when the case is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." **28 U.S.C. § 1605(a)(2)**. Issuing a letter of credit, as Bank Mandiri did, plainly is commercial activity. And since a New York branch of Bank Mandiri was the issuing bank on the Letter of Credit and Koplik is an American corporation, Bank Mandiri's refusal to pay on the Letter of Credit had a direct effect in the United States.

- - -End Footnotes- - -
{*40}

As an instrumentality of a foreign state, Bank Mandiri had to be served pursuant to one of the three methods under FSIA section **1608(b)**. **Section 1608(b)(3)** provides, in relevant part:

(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
... (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, *together with a translation of each into the official language of the foreign state*--
(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request

or (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or (C) as directed by order of the court consistent with the law of the place where service is to be made. n50

- - -Footnotes- - -

n50 28 U.S.C. § 1608(b)(3).

- - -End Footnotes- - -
{*41}

The Trustee admittedly did not comply with the service requirements of **section 1608(b)(3)** when he first served the summons and Amended Complaint on Bank Mandiri without a copy translated into Bahasa, the official language of Indonesia. However, this service defect did not prejudice Bank Mandiri, because Bank Mandiri clearly received actual notice of the Amended Complaint as demonstrated by the prompt filing of its Motion to Dismiss. Also, it appears to be undisputed that a certified translation of the summons and Amended Complaint was subsequently sent to Bank Mandiri on June 8, 2005, approximately 35 days after the Amended Complaint was filed. n51

- - -Footnotes- - -

n51 See Friedman Decl. P 6, Ex. D and E; MacGregor Reply Decl. PP 5-7.

- - -End Footnotes- - -

Federal courts in New York have permitted plaintiffs to litigate claims even where service was defective under **section 1608(b)(3)**, as long as the plaintiff cures the service defects and the defendant is not prejudiced. n52 For example, in *Lippus*, the plaintiff failed to serve a translated {*42} copy of the summons and complaint to the defendant, an instrumentality of Germany, in violation of the translation requirement under **section 1608(b)(3)**. n53 However, the court found that there was little to no prejudice to the defendant since the defendant had actual notice of the complaint and the service defects were easily correctable. n54 As a result, the *Lippus* Court denied the defendant's motion to dismiss due to insufficiency of process, and ordered the plaintiff to mail translated copies of the summons and complaint to the defendant within 30 days. n55

- - -Footnotes- - -

n52 *See Daly v. Castro Llanes*, **30 F. Supp. 2d 407, 416-417** (S.D.N.Y. 1998) (Schwartz, J.) (affording plaintiff additional time to cure defect of service under **section 1608(b)(3)** where defendant had actual notice of the lawsuit); *Lippus v. Dahlgren Mfg. Co.*, **644 F. Supp. 1473, 1479** (E.D.N.Y. 1986) (Wexler, J.) (same).n53 *Lippus*, **644 F. Supp. at 1477.**n54 *Id.* at **1479.**n55 *See id.* ("Although the Court cannot understand why plaintiffs never complied with the plain language of [**28 U.S.C. § 1608(b)(3)**], allowing them to perfect service at this time ensures compliance with the words and spirit of the FSIA and allows the lawsuit to go forward. It is uncontested that [the defendant has] long had actual notice of the lawsuit . . . . Furthermore, service defects appear readily curable and . . . there is little tangible prejudice to [the defendant]."). *See also Daly*, **30 F. Supp.2d at 416-17** (allowing plaintiff 30 days to effect proper service of process on the defendant with translated copies of summons and complaint, as required under **§ 1608(b)(3)**).

- - -End Footnotes- - -
{*43}

Additionally, other federal courts, including several in this district, have determined that strict compliance with **section 1608(b)(3)** is not mandatory, and that substantial compliance suffices to satisfy the service requirements. n56 Plaintiffs are found to have substantially complied with **section 1608(b)(3)**, even if translated copies of the summons and complaint were not provided to the defendant, where the defendant had actual knowledge of the summons and complaint and was not prejudiced. n57 The interest in allowing substantial compliance with **section 1608(b)(3)** is that "a technical defect in service should not override the fact that the defendant received actual notice." n58

- - -Footnotes- - -

n56 *See, e.g., Sherer v. Construcciones Aeronauticas, S.A.*, **987 F.2d 1246, 1250 (6th Cir. 1993)** (allowing case to go forward on the merits where actual notice was received, despite the lack of strict compliance with the FSIA); *Sakhrani v. Takhi Corp.*, **1997 U.S. Dist. LEXIS 13812, No. 96-CV-2900, 1997 WL**

33477654, at *6-*7 (S.D.N.Y. Sept. 10, 1997) (Ellis, J.) (discussing the substantial compliance test); *Finamar Investors Inc. v. The Republic of Tadjikistan*, 889 F. Supp. 114, 117-18 (S.D.N.Y. 1995) (Mukasey, C. J.) (same); *Banco Metropolitano, S.A. v. Desarrollo de Autopistas y Carreteras de Guatemala, S.A.*, 616 F. Supp. 301, 304 (S.D.N.Y. 1985) (Sweet, J.) (same).

{*44}

n57 *Banco Metropolitano*, 616 F. Supp. at 304 ("In view of service on the consulate in New York, and in view of the receipt of actual knowledge of the summons and complaint in Guatemala, albeit not in a Spanish version, and without mailing by the clerk of the court, substantial compliance has been achieved . . . ."). *See also Sakhrani*, 1997 **U.S. Dist. LEXIS 13812, 1997 WL 33477654, at *7** (finding that plaintiff did not substantially comply with **section 1608(b)(3)** because plaintiff did not demonstrate that defendant had actual knowledge of summons and complaint); *Finamar Investors*, **889 F. Supp. at 117** (noting that "[s]everal courts have upheld service where the serving party 'substantially complied' with the requirements of the FSIA if actual notice was received . . . ").n58 *Sherer*, **987 F.2d at 1249**.

- - -End Footnotes- - -

The case at hand is similar to those cited above in many respects. The Trustee failed to comply with the service requirements of **section 1608(b)(3)** when he failed to serve Bank Mandiri with copies of the summons and Amended Complaint translated {*45} into Bahasa. But the Court finds that the Trustee substantially complied with **section 1608(b)(3)**, and cured the initial defect by quickly re-serving Bank Mandiri with translated copies. Bank Mandiri was not prejudiced because it had actual notice and knowledge of the Amended Complaint -- as evidenced, *inter alia*, by the fact that Bank Mandiri timely filed an extensive motion to dismiss. And the lawyers at Bank Mandiri's U.S. counsel, one of the most prestigious law firms in the United States, speak and understand English very well.

The Court concludes that the Trustee's failure to serve translated copies to Bank Mandiri is not a basis for dismissing this proceeding, as Bank Mandiri had actual notice and the Trustee subsequently effected proper service.

Conclusion

For the foregoing reasons, Bank Mandiri's Motion to Dismiss is denied in its entirety.

SO ORDERED.

Dated: New York, New York

October 23, 2006

*s/ Robert E. Gerber*

United States Bankruptcy Judge

**IN RE ERIC E. POWELL**

.

1 of 1 DOCUMENT

**In re ERIC E. POWELL, Debtor**

**CIVIL ACTION NO. 06-4085**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 80598*

**November 2, 2006, Decided**
**November 3, 2006, Filed; November 6, 2006, Entered**

**COUNSEL:** [*1] For ERIC E. POWELL, Plaintiff: DAVID A. SCHOLL, LEAD ATTORNEY, NEW-TOWN SQUARE, PA.

For JAY BEST, Appellant: BRIAN R. MILDENBERG, LEAD ATTORNEY, SHERRI J. BRAUNSTEIN, LEAD ATTORNEY, MILDENBERG & STALBAUM PC, PHILADELPHIA, PA.

For JAY BEST, TRUSTEE, Defendant: BRIAN R. MILDENBERG, LEAD ATTORNEY, SHERRI J. BRAUNSTEIN, LEAD ATTORNEY, MILDENBERG & STALBAUM PC, PHILADELPHIA, PA.

For ERIC E. POWELL, Debtor-in-Possess: DAVID A. SCHOLL, LEAD ATTORNEY, NEWTOWN SQUARE, PA.

FREDERIC BAKER, UNITED STATES TRUSTEE, Interested Party, Pro se, PHILA., PA.

For FREDERICK L. REIGLE, CHAPTER 13 TRUSTEE, Trustee: POLLY A. LANGDON, LEAD ATTORNEY, READING, PA.

**JUDGES:** JAN E. DUBOIS, J.

**OPINION BY:** JAN E. DUBOIS

**OPINION:**

### ORDER AND MEMORANDUM

### ORDER

**AND NOW** this 2nd day of November, 2006, upon consideration of the Motion for Leave to Appeal Bankruptcy Court Order (Doc. No. 50, filed August 31, 2006) and Plaintiff's Response to Defendant's Motion for Leave to Appeal Interlocutory Order (Doc. No. 57, filed September 6, 2006), for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that the Motion for Leave to Appeal Bankruptcy Court Order is **DENIED.** [*2]

### MEMORANDUM

### I. BACKGROUND

On February 3, 2005, Chapter 13 debtor, Eric Powell, filed a complaint in the Bankruptcy Court for the Eastern District of Pennsylvania. Debtor asked the Bankruptcy Court to quiet title to a property located in Brooklyn, New York ("the New York property") in debtor. According to the Complaint, debtor's father ("father") and mother ("mother") purchased the New York property in 1987. On April 29, 1998, father and mother executed a Special Power of Attorney, authorizing debtor to execute legal instruments on their behalf. n1 On March 22, 2001, father signed a trust agreement, transferring title of the New York property to defendant, Jay Best, as trustee, for the benefit of Nina and Mendel Cohen, debtor's sister and brother-in-law. In October of 2001, father died. Father's will of November 28, 1995 named debtor as sole heir. n2 Father's will was admitted to probate on July 25, 2003.

n1 Mother died in December of 1998.

n2 Debtor was named sole heir in the event that father's wife predeceased father.

[*3]

Debtor asked the Bankruptcy Court to invalidate father's trust agreement on the ground that Nina and Mendel Cohen fraudulently induced father to deed the property to Best when father lacked the mental and legal capacity to do so. Defendant, Best, moved for summary

judgment, alleging that debtor's claim falls within the probate exception to federal jurisdiction.

## II. THE DECISION OF THE BANKRUPTCY COURT

In *Marshall v. Marshall, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006)*, the Supreme Court revisited the probate exception, which the Court characterized as a "narrow exception" to federal jurisdiction. *Marshall, 126 S. Ct. at 1744*. Recognizing that "[l]ower federal courts have puzzled" over the doctrine, the Supreme Court explained:

> [T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

*Marshall, 126 S. Ct. at 1748.* [*4]

Applying Marshall to this case, the Bankruptcy Court denied defendant's motion for summary judgment in a Memorandum and Order dated August 18, 2006. Bankruptcy Judge Jean K. Fitzsimon ruled that the Bankruptcy Court had jurisdiction to determine whether father's trust was valid for two reasons. First, Bankruptcy Judge Fitzsimon concluded that the disputed trust was an *inter vivos* trust, and not a will substitute. Second, Bankruptcy Judge Fitzsimon concluded that a judgment on the validity of the trust would not interfere with probate proceedings because the New York property was not part of father's estate. n3 As a final point, Bankruptcy Judge Fitzsimon concluded that state legislation, *20 Pa.C.S.A. § 711*, did not divest the Bankruptcy Court of jurisdiction.

> n3 See *Marshall, 126 S. Ct. at 1749* (interpreting the bar on 'interference' with probate proceedings as "the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*.") (quoting *Markham v. Allen, 326 U.S. 490, 66 S. Ct. 296, 90 L. Ed. 256 (1946)*); see also *Abercrombie v. Andrew College, 438 F. Supp. 2d 243, 256 (S.D.N.Y. 2006)* (finding the probate exception inapplicable where claim did not require federal court to distribute assets of decedent's estate, but only to determine

whether additional assets should be added to the estate).

[*5]

The question before this Court is whether to grant an interlocutory appeal of the decision of the Bankruptcy Court to deny the motion for summary judgment.

## III. THE LEGAL STANDARD

Pursuant to *28 U.S.C. § 158(a)*, this Court has jurisdiction to hear appeals from orders of the Bankruptcy Court. Interlocutory appeals from Bankruptcy Court decisions are permitted only with leave from this Court. *28 U.S.C. § 158(a)(3)*.

Neither *§ 158* nor the Bankruptcy Rules provide criteria to determine whether to grant leave to file an interlocutory appeal. Courts faced with this question have applied *28 U.S.C. § 1292(b)*, which sets forth the requirements for interlocutory appeals from district courts to the courts of appeals. See, e.g., *In re Sandenhill, Inc., 304 B.R. 692, 694 (E.D. Pa. 2004)*; *In re Lavelle Aircraft Co., 1995 U.S. Dist. LEXIS 7631, 1995 WL 334325, *2 (E.D. Pa. June 2, 1995)*; *Sterling Supply Corp. v. Mullinax, 154 B.R. 660, 662 (E.D. Pa. 1993)*.

Under *§ 1292(b)*, a court should grant leave to file an interlocutory appeal where three requirements are met: (1) the decision [*6] involves a controlling question of law; (2) there is a substantial ground for difference of opinion; and (3) immediate appeal may materially advance the ultimate termination of the litigation. *Sterling Supply Corp. v. Mullinax, 154 B.R. 660, 662 (E.D. Pa. 1993)* (citing *In re School Asbestos Litigation, 977 F.2d 764, 777 (3d Cir. 1992)*). Moreover, an interlocutory appeal is appropriate only in exceptional circumstances. See, e.g., *Milbert v. Bison Laboratories, Inc., 260 F.2d 431, 433 (3d Cir. 1958)*; *Johnson v. Columbia Casualty Co., 2006 WL 1805979, *1 (E.D. Pa. June 29, 2006)*; *In re Resource Am. Secs. Litig., 2000 U.S. Dist. LEXIS 10640, 2000 WL 1053861, *10 (E.D. Pa. July 26, 2000)*.

## IV. DISCUSSION

With respect to the first factor, the Third Circuit has defined a 'controlling question of law' to 'encompass at the very least every order which, if erroneous, would be reversible error on final appeal.'" *Katz v. Carte Blanche Corp., 496 F.2d 747, 755 (3d Cir. 1974)*. Defendant clearly satisfies this requirement. If erroneous, the decision of the Bankruptcy Court to deny summary judgment [*7] would be reversible error. Nevertheless, the Court concludes that defendant does not satisfy the remaining requirements of *§ 1292(b)*.

Mere disagreement with a ruling does not constitute a substantial ground for difference of opinion, as re-

2006 U.S. Dist. LEXIS 80598, *

quired under the second factor for interlocutory appeal. *Cardona v. General Motors Corporation, 939 F. Supp. 351, 353 (D.N.J. 1996).* Nor is a void or absence of judicial opinion sufficient to satisfy this requirement. *In re Magic Restaurants, Inc., 202 B.R. 24, 26 (D. Del. 1996); Max Daetwyler Corp. v. R. Meyer, 575 F. Supp. 280, 283 (E.D. Pa. 1983).* Instead, a substantial ground for difference of opinion "must arise out of genuine doubt as to the correct legal standard." *P. Schoenfeld Asset Management LLC v. Cendant Corp., 161 F. Supp. 2d 355, 358 (D.N.J. 2001); Cardona, 939 F. Supp. at 353.*

In this case, defendant agrees with the Bankruptcy Court that Marshall is the controlling authority. Moreover, defendant has not identified any case, post-Marshall, that suggests that a federal court may not determine whether an *inter vivos* trust is valid where [*8] the *res* of the trust is not part of a decedent's estate. The Court concludes, therefore, that defendant has not established a substantial ground for difference of opinion as required for interlocutory appeal.

To satisfy the third requirement of *§ 1292(b)* a moving party must also demonstrate that interlocutory appeal will materially advance the termination of the litigation. *Singh v. Daimler-Benz, 800 F. Supp. 260, 263 (E.D. Pa. 1992).* Defendant has not even attempted to persuade the Court of this point. On this issue the Court cannot conclude on the present state of the record that an interlocutory appeal will expedite the termination of the litigation. Thus, the Court concludes that defendant has not fulfilled this requirement.

Finally, the Court recognizes that leave to file an interlocutory appeal should be granted sparingly. See *In re Magic Restaurants, Inc., 202 B.R. at 26-27.* Defendant has not established that the circumstances of this case are so extraordinary as to overcome the presumption against piecemeal litigation.

## V. CONCLUSION

Defendant has not established that there is substantial ground for difference of opinion, [*9] or that immediate appeal will advance this litigation. Nor has defendant demonstrated exceptional circumstances that warrant interlocutory appeal. Accordingly, the Court denies the Motion for Leave to Appeal Bankruptcy Court Order pursuant to *28 U.S.C. §§ 158(a)(3)* and *1292(b).*

**BY THE COURT:**

**/s/ Honorable Jan E. DuBois**

**JAN E. DUBOIS, J.**